## STATE TAX COMMISSION OF UTAH *v.* ALDRICH ET AL., ADMINISTRATORS.

No. 814. Argued March 12, 1942.—Decided April 27, 1942.

*Messrs. J. Lambert Gibson* and *Garfield O. Anderson* for petitioner.

*Mr. Melber Chambers* for respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The sole question presented by this case is whether the State of Utah is precluded by the Fourteenth Amendment from imposing a tax upon a transfer by death of shares of stock in a Utah corporation, forming part of the estate of a decedent who, at the time of his death, was domiciled in the State of New York and held there the certificates representing those shares.

In 1940, Edward S. Harkness died testate, being at that time domiciled in New York. His estate was probated

in New York, where respondents were appointed executors. Respondents were also appointed administrators with the will annexed, in Utah. At the time of his death, Harkness was the owner of 10,000 shares of common stock and 400 shares of preferred stock of the Union Pacific Railroad Co., a Utah corporation. The certificates representing those shares were never within Utah. They were in the possession of Harkness in New York at the time of his death, and are now held by respondents. For many years, the Union Pacific Railroad Co. has kept its stock books and records and transfer agents in New York, and has not maintained any in Utah. These shares are the only property owned by decedent which is claimed to be within the jurisdiction of Utah. At the date of decedent's death, a New York statute allowed as a credit against the estate tax imposed by New York the amount of any constitutionally valid estate or inheritance tax paid to any other state within three years after the decedent's death.[1]

Respondents sought a declaratory judgment in the Utah court holding that the transfer of the shares was not subject to tax by Utah under the provisions of its inheritance tax law.[2] The trial court entered judgment for respond-

---

[1] N. Y. L. 1930, c. 710, § 1, amended L. 1934, c. 639, § 1; McKinney's Cons. L., Bk. 59, Tax Law, § 249–o. This section was repealed by L. 1940, c. 138. For the present provision, see McKinney, *op. cit.*, Cum. Ann. Pt. (1941) § 249–o.

[2] Rev. Stat. Utah, 1933, § 80–12–2 provides:

"A tax equal to the sum of the following percentages of the market value of the net estate shall be imposed upon the transfer of the net estate of every decedent, whether a resident or nonresident of this state:

"Three per cent of the amount by which the net estate exceeds $10,000 and does not exceed $25,000;

"Five per cent of the amount by which the net estate exceeds $25,000."

Sec. 80–12–3 provides:

ents. The Supreme Court of Utah, under the compulsion of *First National Bank* v. *Maine,* 284 U. S. 312, affirmed. 116 P. 2d 923. We granted the petition for certiorari so that the constitutional basis of *First National Bank* v. *Maine* could be reëxamined in the light of such recent decisions as *Curry* v. *McCanless,* 307 U. S. 357, and *Graves* v. *Elliott,* 307 U. S. 383. And see *Commonwealth* v. *Stewart,* 338 Pa. 9, 12 A. 2d 444, aff'd 312 U. S. 649.

There can be no doubt but that the judgment below should be affirmed if *First National Bank* v. *Maine* is to survive, as the judgment in that case prohibited the State of Maine from doing what the State of Utah is here attempting. But we do not think it should survive. And certainly it cannot if the principles which govern the *Curry* and *Graves* cases rest on firm constitutional grounds.

*First National Bank* v. *Maine,* like its forerunners *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U. S. 204, and *Baldwin* v. *Missouri,* 281 U. S. 586, read into the Fourteenth Amendment a "rule of immunity from taxation by more than one state." 284 U. S. p. 326. As we said in the *Curry* case, that doctrine is of recent origin. Prior to 1930, when *Blackstone* v. *Miller,* 188 U. S. 189, was overruled by *Farmers Loan & Trust Co.* v. *Minnesota,* the adjudications of this Court clearly demanded a result opposite from that which obtained in *First National Bank* v. *Maine.* That was recognized by the majority in the latter case (284 U. S. p. 321)—and properly so, because *Blackstone* v. *Miller* rejected the notion that there were constitutional objec-

---

"The value of the gross estate of a decedent shall be determined by including the value at the time of his death of all property, real or personal, within the jurisdiction of this state, and any interest therein, whether tangible or intangible, which shall pass to any person, in trust or otherwise, by testamentary disposition or by law of inheritance or succession of this or any other state or country, or by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor or donor, or intended to take effect in possession or enjoyment at or after his death."

tions to double taxation of intangibles by States which had command over them or their owner. And see *Kidd* v. *Alabama,* 188 U. S. 730, 732. *Blackstone* v. *Miller* permitted New York to tax the transfer of debts owed by New York citizens to a decedent who died domiciled in Illinois, although Illinois had taxed the entire succession. Mr. Justice Holmes, speaking for the Court, upheld the power of New York to collect the tax because the transfer of the debts "necessarily depends upon and involves the law of New York for its exercise." 188 U. S. p. 205. It was that view which the minority in *First National Bank* v. *Maine* championed. They maintained that there was no constitutional barrier to taxation by Maine of the transfer of the shares of stock of the Maine corporation, since the nature and extent of the decedent's interest in the shares were "defined by the laws of Maine, and his power to secure the complete transfer" was "dependent upon them." 284 U. S. p. 332. That view had been repeatedly expressed in other earlier cases touching on the rights of a State to tax intangibles over which it had command though the owner was a non-resident. *Tappan* v. *Merchants' Nat. Bank,* 19 Wall. 490, 503–504; *Hawley* v. *Malden,* 232 U. S. 1, 12; *Baker* v. *Baker, Eccles & Co.,* 242 U. S. 394, 401; *Frick* v. *Pennsylvania,* 268 U. S. 473, 497; *Rhode Island Hospital Trust Co.* v. *Doughton,* 270 U. S. 69, 81. As stated by Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 429, the power to tax "is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a state extends, are objects of taxation. . . ."

It was that view which we followed in the *Curry* case. We held there that the Fourteenth Amendment did not prevent both Alabama and Tennessee from imposing death taxes upon the transfer of an interest in intangibles held in trust by an Alabama trustee but passing under the will of a beneficiary decedent domiciled in Tennessee.

We stated that rights to intangibles "are but relationships between persons, natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in courts. The power of government over them and the protection which it gives them cannot be exerted through control of a physical thing. They can be made effective only through control over and protection afforded to those persons whose relationships are the origin of the rights. . . . Obviously, as sources of actual or potential wealth—which is an appropriate measure of any tax imposed on ownership or its exercise—they cannot be dissociated from the persons from whose relationships they are derived. These are not in any sense fictions. They are indisputable realities." 307 U. S. p. 366. We held that the power to tax intangibles was not restricted to one State, whether "we regard the right of a state to tax as founded on power over the object taxed, as declared by Chief Justice Marshall in *McCulloch* v. *Maryland, supra,* through dominion over tangibles or over persons whose relationships are the source of intangible rights; or on the benefit and protection conferred by the taxing sovereignty, or both." *Id.* pp. 367–368. And we added: "Shares of corporate stock may be taxed at the domicile of the shareholder and also at that of the corporation which the taxing state has created and controls; and income may be taxed both by the state where it is earned and by the state of the recipient's domicile. Protection, benefit, and power over the subject matter are not confined to either state." *Id.*, p. 368. In the recent case of *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444, we gave renewed expression to the same view: "A state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has

conferred by the fact of being an orderly, civilized society." And see *Graves* v. *Schmidlapp,* 315 U. S. 657.

Furthermore, the rule of immunity against double taxation espoused by *First National Bank* v. *Maine,* had long been rejected in other cases. *Kidd* v. *Alabama, supra; Fort Smith Lumber Co.* v. *Arkansas,* 251 U. S. 532; *Cream of Wheat Co.* v. *Grand Forks,* 253 U. S. 325. We rejected it again only recently. *Illinois Central R. Co.* v. *Minnesota,* 309 U. S. 157. And as we pointed out in the *Curry* case, the reasons why the Fifth Amendment "does not require us to fix a single exclusive place of taxation of intangibles for the benefit of their foreign owner" (*Burnet* v. *Brooks,* 288 U. S. 378) are no less cogent in case of the Fourteenth. 307 U. S. pp. 369, 370.

The recent cases to which we have alluded are all distinguishable on their facts. But their guiding principles are irreconcilable with the views expressed in *First National Bank* v. *Maine.* If we raised a constitutional barrier in this case after having let it down in the *Curry* case, we would indeed be drawing neat legal distinctions and refinements which certainly cannot be divined from the language of the Constitution. Certainly any differences between the shares of stock in this case and the intangibles in the *Curry* case do not warrant differences in constitutional treatment so as to forbid taxation by two States in the one case and to permit it in the other. If we perpetuated any such differences, we would be doing violence to the words "due process" by drawing lines where the Fourteenth Amendment fails to draw them. Furthermore, the legal interests in the intangibles here involved are as diverse as they were in the intangibles in the *Curry* case. And to say that these shares of stock were localized or had an exclusive situs in New York would be to indulge in the fiction which we rejected in the *Curry* case. Any such attempt to fix their

whereabouts in New York would disregard the intimate relationship which Utah has to this corporation and its shares.

More specifically, if the question is "whether the state has given anything for which it can ask return" (*Wisconsin* v. *J. C. Penney Co., supra*, p. 444), or whether the transfer depends upon and involves the law of Utah for its exercise (*Blackstone* v. *Miller*), there can be no doubt that Utah is not restrained by the Fourteenth Amendment from taxing this transfer. The corporation owes its existence to Utah. Utah law defines the nature and extent of the interest of the shareholders in the corporation. Utah law affords protection for those rights. Utah has power over the transfer by the corporation of its shares of stock. Certainly that protection, benefit, and power over the shares would have satisfied the test of *Blackstone* v. *Miller* and *Curry* v. *McCanless*. But it is said that we are here interested only in the *factum* of the transfer, and that the stockholder in the case at bar had no need to invoke the law of Utah to effect a complete transfer of his interest. The argument is based on the fact that the transfer office is located outside Utah, and that, under the Uniform Stock Transfer Act which Utah has adopted (Rev. Stat. 1933 §§ 18–3–1 *et seq.*), the trend is to treat the shares as merged into the certificates in situations involving the ownership and transfer of the shares. We do not stop to analyze the many cases which have been cited, nor to speculate as to how Utah would interpret its law in this regard. Suffice it to say, that if that freedom of transfer exists as respondents claim, it stems from Utah law. It finds its ultimate source in the authority which Utah has granted. It is indeed a benefit which Utah has bestowed. For it alone Utah may constitutionally ask a return. In view of these realities, we cannot say with the majority in *First National Bank* v. *Maine,* p. 327, that a "transfer from the dead to the living of any specific property is an event

single in character and is effected under the laws, and occurs within the limits, of a particular state," so as to preclude Utah from imposing a tax on this transfer.

We are of course not unmindful of the notions expressed in *Farmers Loan & Trust Co.* v. *Minnesota,* and repeated in *First National Bank* v. *Maine,* that the view championed by *Blackstone* v. *Miller* disturbed the "good relations among the States" and had a "bad" practical effect which led many States "to avoid the evil by resort to reciprocal exemption laws." 280 U. S. p. 209. But, as stated by the minority in *First National Bank* v. *Maine,* "We can have no assurance that resort to the Fourteenth Amendment, as the ill-adapted instrument of such a reform, will not create more difficulties and injustices than it will remove." 284 U. S. p. 334. More basically, even though we believed that a different system should be designed to protect against multiple taxation, it is not our province to provide it. See *Curry* v. *McCanless, supra,* pp. 373–374. To do so would be to indulge in the dangerous assumption that the Fourteenth Amendment "was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions." Mr. Justice Holmes, dissenting, *Baldwin* v. *Missouri, supra,* p. 595. It would violate the first principles of constitutional adjudication to strike down state legislation on the basis of our individual views or preferences as to policy, whether the state laws deal with taxes or other subjects of social or economic legislation.

For the reasons stated, we do not think that *First National Bank* v. *Maine* should survive. We overrule it. In line with our recent decisions in *Curry* v. *McCanless, Graves* v. *Elliott* and *Graves* v. *Schmidlapp,* we repeat that there is no constitutional rule of immunity from taxation of intangibles by more than one State. In case of shares of stock, "jurisdiction to tax" is not restricted to the domiciliary State. Another State which has extended benefits

or protection, or which can demonstrate "the practical fact of its power" or sovereignty as respects the shares (*Blackstone* v. *Miller*, p. 205), may likewise constitutionally make its exaction. In other words, we restore these intangibles to the constitutional status which they occupied up to a few years ago. See *Greves* v. *Shaw*, 173 Mass. 205, 53 N. E. 372; *Larson* v. *MacMiller*, 56 Utah 84, 189 P. 579, and cases collected in 42 A. L. R. pp. 365 *et seq.*

We reverse the judgment below and remand the cause to the Supreme Court of Utah for proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE FRANKFURTER, concurring:

A case of this kind recalls us to first principles.

The taxing power is an incident of government. It does not derive from technical legal concepts. The power to tax is coextensive with the fundamental power of society over the persons and things made subject to tax. Each State of the Union has the same taxing power as an independent government, except insofar as that power has been curtailed by the federal Constitution.

The taxing power of the States was limited by the Constitution and the original ten amendments in only three respects: (1) no State can, without the consent of Congress, lay any imposts or duties on imports or exports, except as necessary for executing its inspection laws, Art. I, § 10 [2]; (2) no State can, without the consent of Congress, lay any tonnage duties, Art. I, § 10 [3]; and (3) by virtue of the Commerce Clause, Art. I, § 8 [3], no State can tax so as to discriminate against interstate commerce. (For present purposes, I put the Contract Clause to one side). None of these limitations touches the power of a State to create corporations and the incidental power to tax opportunities which such State-created corporations afford.

This phase of the taxing power, rooted in the established practices of the States in common with other governments, was not suddenly abrogated on July 28, 1868, when the Fourteenth Amendment became the law of the land. On the contrary, taxes based on the States' power over corporations of their own creation thereafter became an increasingly familiar source of revenue. Of course, the Due Process Clause has its application to the taxing powers of the States—a State cannot tax a stranger for something that it has not given him. When a State gives nothing in return for exacting a tax, it may be said that there is no "jurisdiction to tax." But that phrase obscures rather than enlightens, for it only states a result and does not analyze the Constitutional problem. The right of a State to tax the effective acquisition of membership in a domestic corporation, wherever the piece of paper representing such a taxable interest may be physically located,—the immediate question before us—was not doubted until the decision of this Court only ten years ago in *First National Bank* v. *Maine*, 284 U. S. 312. That decision, as was made clear in its dissent, was an unwarranted deviation from unbroken legal history and fiscal practice. Drawn as the decision was "from the void of 'due process of law', when logic, tradition and authority have united to declare the right of the State to lay" such a tax (Holmes, J., dissenting in *Baldwin* v. *Missouri*, 281 U. S. 586, 596), due regard for the Constitution demands that the deviation be not perpetuated and that the power erroneously withdrawn from the States be again recognized.

Modern enterprise often brings different parts of an organic commercial transaction within the taxing power of more than one State, as well as of the Nation. It does so because the transaction in its entirety may receive the benefits of more than one government. And the exercise by the States of their Constitutional power to tax may

undoubtedly produce difficult political and fiscal problems. But they are inherent in the nature of our federalism and are part of its price. These difficulties are not peculiar to us. Kindred problems have troubled other constitutional federalisms. For Australia, see Report of the Royal Commission on the Constitution, Parliament of the Commonwealth of Australia (1929), p. 187 *et seq.;* for Canada, see 1 Report of the Royal Commission on Dominion-Provincial Relations (1940), p. 202 *et seq.*

"A good deal has to be read into the Fourteenth Amendment to give it any bearing upon this case." Holmes, J., dissenting in *Farmers Loan Co.* v. *Minnesota,* 280 U. S. 204, 218. We would have to read into that Amendment private notions as to tax policy. But whether a tax is wise or expedient is the business of the political branches of government, not ours. Considerations relevant to invalidation of a tax measure are wholly different from those that come into play in justifying disapproval of a tax on the score of political or financial unwisdom.

It may well be that the last word has not been said by the various devices now available—through uniform and reciprocal legislation, through action by the States under the Compact Clause, Art. I, § 10[3], or through whatever other means statesmen may devise—for distributing wisely the total national income for governmental purposes as between the States and the Nation. But even if it were possible to make the needed adjustments in the fiscal relations of the States to one another and to the Federal Government through the process of episodic litigation— which to me seems most ill-adapted for devising fiscal policies—it is enough that our Constitutional system denies such a function to this Court.

I agree, therefore, that *First National Bank* v. *Maine* should be overruled and that the tax imposed by Utah

in this case is valid. To refuse to nullify legislation the frailties of which we think we see, is to respect the bounds of our Constitutional authority and not to indulge in a fiction. See James Bradley Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Harv. L. Rev. 129. To allow laws to stand is to allow laws to be made by those whose task it is to legislate. The nullification of legislation on Constitutional grounds has been recognized from the beginning as a most "delicate" function, not to be indulged in by this Court simply because it has formal power to do so, but only when compelling considerations leave no other choice. To suggest that when this Court finds that a law is not offensive to the Constitution and that it must therefore stand, we make the same kind of judgment as when on rare occasions we find that a law is offensive to the Constitution and must therefore fall, is to disregard the rôle of this Court in our Constitutional system since its establishment in 1789.

MR. JUSTICE JACKSON, dissenting:

State taxation of transfer by death of intangible property is in something of a jurisdictional snarl, to the solution of which this Court owes all that it has of wisdom and power. The theoretical basis of some decisions in the very practical matter of taxation is not particularly satisfying.[1] But a switch of abstract concepts is hardly to be expected without at least careful consideration of its impact on the very practical and concrete problems of States and taxpayers.

---

[1] Of one of them, Mr. Justice Holmes said: "It seems to me that the result reached by the Court probably is a desirable one, but I hardly understand how it can be deduced from the Fourteenth Amendment . . ." *Union Refrigerator Transit Co.* v. *Kentucky*, 199 U. S. 194, 211.

Weighing the highly doctrinaire reasons advanced for this decision against its practical effects on our economy and upon our whole constitutional law of state taxation, I can see nothing in the Court's decision more useful than the proverbial leap from the frying pan into the fire.

I

There is little persuasion and certainly no compulsion in the authorities mustered by the Court's present opinion, which are either admittedly overruled cases, such as *Blackstone* v. *Miller,* 188 U. S. 189, or admittedly distinguishable ones, such as *Curry* v. *McCanless,* 307 U. S. 357; *Graves* v. *Elliott,* 307 U. S. 383; *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435. Such authorities are not impressive in vindication of such a judgment. Without discussion of the academic merits of the decision that is being overruled, I am willing to proceed on the estimate of it made at the time of its pronouncement by the present CHIEF JUSTICE, who said in his dissent: "*Situs* of an intangible, for taxing purposes, as the decisions of this Court, including the present one, abundantly demonstrate, is not a dominating reality, but a convenient fiction which may be judicially employed or discarded, according to the result desired." *First National Bank* v. *Maine,* 284 U. S. 312, 332. The Court now discards this fiction in favor of one calling for a different result.

This older rule ascribed a fictional consequence to the domicile of a natural person; it is overruled by ascribing a fictional consequence to the domicile of an artificial corporation. The older rule emphasized dominance by the individual over his intangible property, the tax situs of which followed the domicile of its owner. Today's new rule emphasizes the dominance of the corporation, a crea-

ture of the legal imagination.[2] To this fictional person-
ality it ascribes a hypothetical "domicile" in a place where
it has but a fraction of its property and conducts only its
formal corporate activities; and on the union of these two
fictions it permits the chartering State to tax the estates
of persons who never lived or did business therein. The
reasoning back of the holding is this: Because Utah issued
a charter to a corporation, which issued stock to a non-
resident, which changed hands at his death, which required
a transfer on the corporation's books, which transfer was
permitted by Utah law, Utah got jurisdiction to tax suc-
cession to the stock. It is really as remote as that.

No one questions that a State which charters a corpo-
ration, even though it amounts to no more than giving
"to airy nothing a local habitation and a name," has the
right to exact a charter fee, an incorporation tax, or a
franchise tax from the artificial entity it has created. But
that such chartering enables the taxing arm of the State
to reach the estate of every stockholder, wherever he lives,
and to tax the entire value of the stock because of "oppor-
tunities which it has given," "protection which it has
afforded," or "benefits which it has conferred" is quite
another matter. Utah is permitted to tax the *full value*

---

[2] A corporation is defined by John Marshall as "an artificial being,
invisible, intangible, and existing only in contemplation of law."
*Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 636. The
New York Court of Appeals has said: "A corporation, however, is a
mere conception of the legislative mind. It exists only on paper
through the command of the legislature that its mental conception shall
be clothed with power." *People* v. *Knapp*, 206 N. Y. 373, 381, 99 N. E.
841, 844. "It took half a century of litigation in this Court finally to
confer on a corporation, through the use of a fiction, citizenship in the
chartering state for jurisdictional purposes. . . . Throughout, the mode
of thought was metaphorical." MR. JUSTICE FRANKFURTER, in *Neirbo
Co.* v. *Bethlehem Shipbuilding Corp.*, 308 U. S. 165, 169. Compare
the cases where courts are obliged to disregard the corporate entity to
avoid a variety of injustices. See Wormser, Disregard of the Corporate
Fiction (1927).

of each share of Union Pacific stock passing by death. Any conceivable "opportunity," "protection," or "benefit" derived by the Union Pacific stockholders from Utah is negligible in proportion to the values Utah is authorized to tax.

It would be hard to select a case that would better demonstrate the fictional basis of the Court's doctrine of benefits and protection than this case of Utah and the Union Pacific Railroad. When Utah was admitted to statehood in 1896, the Union Pacific Railroad was already old as a national institution. The first white settlement in Utah made by the Mormons was in its second year when President Taylor recommended to Congress consideration of a railroad to the Pacific as a "work of great national importance and of a value to the country which it would be difficult to estimate." [3] In 1853, Congress appropriated $150,000 to make explorations and surveys to "ascertain the most practical and economical route." [4] In 1860, both the leading political parties in their platforms declared in favor of building such a road.[5] President Lincoln, on July 1, 1862, signed [6] the war measure creating the Union Pacific Railroad Company and subsidizing the construction of the road,[7] which opened on

[3] 6 Messages and Papers of the Presidents 2558, Message of December 4, 1849. President Buchanan also repeatedly recommended the road as a defense necessity to be constructed under the war power. *Id.* at 2988; *Id.*, Vol. 7, at 3057, 3103, 3181.

[4] 10 Stat. 219.

[5] Trottman, History of the Union Pacific (1923) 8.

[6] Sandburg, Abraham Lincoln—The War Years, Vol. 1, 510. See also Vol. 2, 461, for an account of Lincoln's selection of the location of its eastern terminal.

[7] It granted a right of way across the public lands owned by the United States and a subsidy loan of $16,000 per mile for the construction on the plain, $48,000 per mile for one hundred and fifty miles over the Rocky Mountains, and $32,000 per mile for the remainder. The construction amounted to 1,034 miles, and the subsidy loan to $27,236,512. The Central Pacific, for 883 miles constructed from San Francisco to

May 10, 1869.[8]  The story of the Union Pacific has been a part of our national history.  Not even its scandals were local.  Its Credit Mobilier scandal rocked the Nation.[9]

The road continued to be a national problem as well as a national enterprise.  President Cleveland recommended to Congress in his message of December 3, 1894 consideration of reorganization.[10]  The steps taken by the Government were reported to the Congress by President McKinley in his annual messages of 1897, 1898, and 1899.  He reported the sale of the Union Pacific main line under the decree of the United States Court for the District of Nebraska on November 1 and 2, 1897.[11]  Utah, on July 1, 1897, granted a charter to the present Union Pacific Railroad Company, as the Federal Government or any one of several state governments might have done.  It has become one of the great and stable transportation systems of the United States.

If it had only the "opportunities" and "benefits" conferred by Utah and only the properties protected by her laws, the Union Pacific would cut little figure either in transportation or finance.  It holds its stockholders' meetings in that State.  But it maintains no executive office or stock transfer office in Utah.  Its executive and stock transfer offices are in New York City.  Its stocks are listed on the New York, Boston, London, and Amsterdam stock exchanges.  Over 200,000 shares of its stock were traded on the New York Stock Exchange in 1939.[12]  Its western operating office is not in Utah, but in Omaha, Nebraska. It is stipulated that less than 9% of its 9877 miles of

meet the Union Pacific, received nearly an equal amount.  12 Stat. 489. Further grants were made by an Act of July 2, 1864, 13 Stat. 356.

[8] 11 Messages and Papers of the Presidents 638.

[9] Bowers, The Tragic Era (1929) 396 *et seq.*

[10] 13 Messages and Papers of the Presidents 5969.

[11] 13 Messages and Papers of the Presidents 6273, 6343, 6390.

[12] Moody's Steam Railroads (1940) 907.

trackage are in Utah and that, during 1939, the railway operating revenue from Utah intrastate business plus the Utah proportion on a mileage basis of its interstate business was 8.97% of the entire gross operating revenues of the company.

What gives the Union Pacific stock its value, all of which is appropriated by this decision to Utah's taxing power, is its operation in interstate commerce, a privilege which comes from the United States and one which Utah does not give or protect and could not deny. The Union Pacific system itself is in interstate operation, embracing thirteen states and drawing its business from the whole country. Approximately 37% of its total tonnage was received from connecting lines.[13] If the values derived from privileges extended by the National Government and from rendering national transportation were to be allocated to any single State for tax purposes, a realistic basis would entitle the five States of Idaho, Kansas, Nebraska, Oregon, and Washington to some consideration, for each embraces, authorizes, and protects by its laws more miles of trackage than does Utah.[14]

These facts leave nothing of Utah's claim to tax the full value of Union Pacific shares when transferred by death of a nonresident stockholder, and no basis for the Court's decision that it may do so, except the metaphysics of the corporate charter.

## II

The theories on which this case is decided contrast sharply with certain hard facts which measure the decision's practical wisdom or lack of it.

---

[13] Moody's Steam Railroads (1940) 895.

[14] Mileage of the system is as follows: (1) Idaho, 2051.12; (2) Nebraska, 1355.68; (3) Oregon, 1172.48; (4) Kansas, 1159.87; (5) Washington, 1047.04; (6) Utah, 888.47; (7) Wyoming, 717.32; (8) Colorado, 609.13; (9) California, 390.52; (10) Nevada, 358.12; (11) Montana, 143.46; (12) Iowa, 2.48; (13) Missouri, 2.16. Moody's Steam Railroads (1940) 893.

1. The effect of the Court's decision is to intensify the already unwholesome conflict and friction between the States of the Union in competitive exploitation of intangible property as a source of death duties.

The practical issue underlying this case is not whether the Harkness estate shall pay or avoid a transfer tax. The issue is whether Utah or New York will collect this tax. It is admitted that if this Court breathes constitutionality into this Utah tax, all that Utah gets will be credited to the Harkness estate on its tax payable in New York as the State of domicile. The right of a State to tax succession to corporate stock by death of one domiciled therein, while not abrogated, is now subjected to an interfering and overlapping right of the State which chartered the corporation to tax the same stock transfer on a different and inconsistent principle. Since the chartering State has apparently been empowered to exact its tax as a condition of permitting the transfer, the taxing power of the State of the stockholder's domicile is really subordinated and deferred to the taxing power of the chartering State. By laying its tax on the gross value transferred, irrespective of the net value of the decedent's estate, the chartering State may give its tax an effective priority of payment over the taxes laid by the domiciliary State and may collect what amounts to an inheritance tax even when there is no net estate to transfer. Thus, through the corporate charter fiction, the chartering State may thrust its own tax with extra-territorial effect between the taxing power of the State of domicile and tax resources to which that State has had, and I think should have, first and, under ordinary circumstances, exclusive resort.

2. To subject intangible property to many more sources of taxation than other wealth, prejudices its relation to other investments and other wealth by a discrimination which has no basis in the function that intangibles per-

192

form for our present society.[15]   Intangibles, except for government issues, are an outgrowth of our modern corporation system.  Of relatively recent growth, the corporation has become almost the unit of organization of our economic life.  Whether for good or ill, the stubborn fact is that in our present system the corporation carries on the bulk of production and transportation, is the chief employer of both labor and capital, pays a large part of our taxes, and is an economic institution of such magnitude and importance that there is no present substitute for it except the State itself.  Except for the easy circulation and ready acceptability of pieces of paper characterized as stocks or bonds, this existing system could not function. It is these intangible symbols  or tokens which give liquidity and mobility to otherwise fixed underlying plant assets, which give ready negotiability to fractional interests therein that would otherwise transfer with difficulty, and which divide among many both benefits and risks from aggregation of properties whose successful functioning for society requires unified management of the bulk.   The amount of plant and material and goods in process, working capital, good will, and organization at any time devoted

[15] The burdens imposed by the present decision are cumulative and must be considered in relation to taxation of intangibles in some circumstances by States other than that of domicile (*Curry* v. *McCanless*, 307 U. S. 357; *Graves* v. *Elliott*, 307 U. S. 383), and also in reference to the closing of the federal courts to both State and taxpayers where different state courts make inconsistent findings on domicile resulting in estate taxation by two or more States.  *Massachusetts* v. *Missouri*, 308 U. S. 1; *Texas* v. *Florida*, 306 U. S. 398; *Worcester County Trust Co.* v. *Riley*, 302 U. S. 292; *New Jersey* v. *Pennsylvania*, 287 U. S. 580; *Dorrance* v. *Pennsylvania*, 287 U. S. 660 and 288 U. S. 617, certiorari denied to review *Dorrance's Estate*, 309 Pa. 151; *Hill* v. *Martin*, 296 U. S. 393; *Dorrance* v. *Martin*, 298 U. S. 678, certiorari denied to review *Dorrance* v. *Thayer-Martin*, 116 N. J. L. 362; Sargent and Tweed, Death and Taxes are Certain—But What of Domicile?, 53 Harvard L. Rev. 68; cf. *Treinies* v. *Sunshine Mining Co.*, 308 U. S. 66.

to enterprise substantially will depend upon the willingness of the public to stand in the position of stockholder or bondholder. When this Court determines that the effect of owning this type of circulating medium is to subject the estate of the owner to an inheritance tax from every State that chartered one of the companies in which he has invested, it imposes a handicap on such ownership that is substantial and influential upon our economy.

Not one substantial evil is said by the opinion in this case to flow from the rule being upset, and evils of some magnitude admittedly follow from the one being reinstated. These consequences the Court declines even to consider, although they bear upon a segment of our economy bigger than the national debt [16] and affect more persons than are now in the armed forces.[17]   Intangibles

[16] U. S. Treasury Statistics of Income for 1938, Part II, p. 4 (latest available) shows that 520,501 corporations filed returns.   169,884 of them reported net income aggregating $6,525,979,257, while 301,148 reported an aggregate loss for the year of $2,853,097,727.

The Commissioner computes dividends paid in cash or assets other than stock to have been $5,013,432,827.   *Id.* at 22.

Balance sheets were submitted by 411,941 corporations showing total assets of $300,021,727,000.   *Id.* at 28.

The volume of intangibles afloat as a result of corporate financing is not specifically calculated, but some idea of it is gleaned from the aggregate of items as follows:

Common stocks.............. $74, 791, 662,000
Preferred stocks............   18, 108, 066, 000
Bonds, notes and mortgages—
    maturity 1 year or more..   50, 278, 233, 000   *Ibid.*

[17] I know of no accurate calculation of the number of persons who hold stocks or bonds. Many estimates are extravagant and include an enormous  amount of duplications—for example, the aggregate of stockholders' lists of all corporations. I think the estimate of Berle and Means as of 1927 that between four and six million persons owned stocks, including an estimated two million employee or customer stockholders, is a reasonable one. The Modern Corporation and Private Property (1934) 374.   Many are, of course, also bondholders, and the

constitute well above 50% of all property transferred by death,[18] and an even greater proportion of that transferred by gift, which I assume is equally vulnerable to this tax.[19] The gravity of subjecting such extensive interests to complex, confusing, and overlapping tax jurisdictions should be weighed against the reasons advanced for the change.

The revenue that the States may collect in consequence of this decision is not the measure of the burden it imposes on taxpayers. The ascertainment of taxes of this type is costly and wasteful. Such taxation frequently

number to be added after allowing for duplication is difficult to estimate. It must also, of course, be borne in mind that this includes many very small holdings and that such statistics are of little value in considering the relative benefits from such holdings derived by those in different income brackets.

[18] United States Treasury Statistics of Income for 1938, Part I, p. 220, shows that 15,221 estates filed returns showing total gross estates of $2,746,143,000, of which real estate was $433,487,000, tangible personal property, $34,637,000, and intangible personal property $2,278,019,000.

The intangibles so reported included:

| | |
|---|---|
| Capital stock in corporations | $1,079,231,000 |
| State and municipal bonds | 242,537,000 |
| Government bonds | 148,802,000 |
| Other bonds | 164,796,000 |

Of course it does not follow that the same proportions hold good for estates too small to be reported under federal law. Because they would be more heavily weighted with farm and home owning, I am confident these statistics do not present proportions applicable to all transfers by death. They do, I believe, sustain the statement made in the text.

[19] United States Treasury Statistics of Income for 1938, Part I, p. 264, show total gifts reported for taxation as—

| | |
|---|---|
| Real Estate | $41,241,000 |
| Stocks and Bonds | 214,583,000 |
| Cash | 72,390,000 |
| Insurance | 21,795,000 |
| Miscellaneous | 49,764,000 |

requires taking out ancillary letters in the State of the corporation's domicile, the hiring of local counsel, the furnishing of affidavits to local probate courts and inheritance tax officials, and the payment of various fees, costs, and expenses. For the assurance of local creditors, bonds are sometimes required and long kept in force. Realization upon assets and distribution of estates is delayed by inability to get waivers or consents to transfer until after extensive proceedings have been conducted. The seriousness of these burdens is increased if the decedent owns stock in consolidated corporations incorporated in several States; and under this decision stocks of some consolidated railroads would be subject to tax on their full values by five or six States. One need not be unduly soft-hearted towards taxpayers to doubt whether the exhaustion of estates through multiplication of reports, returns, appraisals, litigation, counsel fees, and expenses ultimately makes for a sound fiscal policy or an enlightened social policy.

Moreover, the burdens imposed by this type of taxation are unequal and capricious and in inverse order to the ability of the estate to pay. I suppose we need have little anxiety about Mr. Harkness's $87,000,000 net estate with its $1,000,000 investment in Union Pacific stock. As we have pointed out, it is not he, but the State of New York, that will pay this tax to the State of Utah. And if New York had no provision in its statutes for credit and Mr. Harkness could have foreseen the shift of position of this Court, it is not likely that he would have been caught with the tax. Those who have large estates and watchful lawyers will find ways of minimizing these burdens. But Mr. Harkness is not a typical Union Pacific stockholder. In 1939, the Union Pacific had 50,131 stockholders.[20] The many small stockholders can-

---

[20] Moody's Steam Railroads (1940) 888.

not afford professional counsel or evasion devices. The burden of reports and appraisals and foreign tax proceedings bears heavily upon them because of the relatively small amount involved in their transfers. The new tax we have authorized undermines the principle of graduation of tax burdens in proportion to ability to pay. No tax laid on anything less than the total net worth of the estate can be graduated even roughly according to the principle which progressive modern taxation strives to heed. The imposition of unpredictable assessments from many sources makes it impossible for the State of domicile to make intelligent use of its own taxing power as an instrument of enlightened social policy. Chaos serves no social end.

3. A large majority of the States, by experience prior to the *First National Bank* v. *Maine* decision, found the system of taxation which this Court imposes on all States today to be unworkable and to constitute a threat to the death tax on intangibles as a State source of revenue. Competitive use by the States of death taxation and immunities invited federal invasion of the field, one phase of which was the enactment by Congress of § 301, Revenue Act of 1926, sustained by this Court in *Florida* v. *Mellon*, 273 U. S. 12. There the Federal Government had laid an estate tax, but retained only 20% of the revenue and used an 80% credit provision to equalize the demands of the States. There was an uneasy premonition among the States that overlapping, capricious, and multiple taxation would lead to Federal occupation of the field. Appearing in the *First National Bank* case as *amicus curiae,* the New York State Tax Commission urged that both principle and policy prevent the levying of taxes by more than one jurisdiction, and added: "The New York Tax Commission

believes that the present is a crucial period in the development of death taxation in this country and that a false step may make it difficult for the states to retain the death tax as a source of substantial revenue." We revive their difficulties.

Farsighted States saw that the total revenue resources practically available to the States was not increased by overlapping their taxation and invading each other's domiciliary sources of taxation. Many felt that justice required credits to their own domiciled decedents' estates for taxes exacted elsewhere, and the credits granted offset largely the revenue derived from the tax. The multiple taxation added substantially to the cost of administration and to the annoyance of taxpayers. Because of these considerations, at the time of argument of *First National Bank* v. *Maine,* thirty-seven States had enacted reciprocity statutes which voluntarily renounced revenues from this type of taxation. The Court was urged to stay the hand of sister States which would not coöperate. The restraint laid by this Court in response to those appeals is now withdrawn at the behest of a State which has at no time enacted a reciprocity statute or given a credit for such taxes paid by its domiciled decedents elsewhere. We have not heard the views of any other State nor considered their concern about retaining the source of taxation opened to them. I do not doubt that today's decision will give a new impetus to Federal absorption of this revenue source and to Federal incorporation of large enterprises.

4. An unfortunate aspect of this decision is that, in common with other judge-made law, it has retroactive effect. Consequently, inequalities and injustices will be suffered by States as well as by individuals. For example, the State of New York has written into its own Constitu-

tion the limitations on its taxing power which this Court had established by the decision we now overrule.[21] Until it can adjust its constitutional provisions, such a State may not take advantage of the tax privileges the Court confers today, although other States may do so. We have not been advised as to the number of States which have repealed or modified reciprocity or credit provisions in their own statutes or constitutions in reliance upon the decision we overrule. Credit provisions contained in statutes may be the foundation for claims for refund against domiciliary States as chartering States proceed to take advantage of the privilege of retroactive taxation accorded them by this decision. Estates closed and distributed under existing laws become indebted by force of this decision to chartering States on claims for transfer tax that may have existed in the state statutes but had never been suspected of having constitutional validity. For what periods these claims may have vitality depends on state

---

[21] Article XVI, § 3 of the New York State Constitution, adopted in 1938, provides:

"Moneys, credits, securities and other intangible personal property within the state not employed in carrying on any business therein by the owner shall be deemed to be located at the domicile of the owner for purposes of taxation, and, if held in trust, shall not be deemed to be located in this state for purposes of taxation because of the trustee being domiciled in this state, provided that if no other state has jurisdiction to subject such property held in trust to death taxation, it may be deemed property having a taxable situs within this state for purposes of death taxation. Intangible personal property shall not be taxed ad valorem nor shall any excise tax be levied solely because of the ownership or possession thereof, except that the income therefrom may be taken into consideration in computing any excise tax measured by income generally. Undistributed profits shall not be taxed."

That decision apparently ended the necessity for reciprocal exemption and I know of none enacted since. Texas and Missouri appear to have omitted reciprocal exemption provisions in later revisions of their inheritance tax laws.

statutes of limitation. Whether personal liability may be asserted against executors and administrators for failure to pay taxes that our decisions did not tolerate at the time the estates were closed, likewise depends on the laws of the chartering States. With confidence we may anticipate that this decision will produce much confusion, some controversy between the States, and a lusty crop of litigation.

## III

The Court casts aside former limitations on state power to tax nonresidents in such terms as to leave doubt whether any legal limitations are hereafter to be recognized or applied. The opinion of the Court says that the State may "constitutionally make its exaction" "which can demonstrate 'the practical fact of its power.'" The concurring opinion adds that "Each State of the Union has the same taxing power as an independent country, except insofar as that power has been curtailed by the federal Constitution," and it enumerates three limitations, each of which prohibits a kind of tax or protects kinds of business from tax; but none of them restrains taxation by reference to what we have usually expressed by "jurisdiction." It is true that the concurring opinion says that "the Due Process Clause has its application to the taxing power of the States," but we are not told what it may be, and it is difficult to conceive of a situation where it will ever be useful if it may not be considered as a test of jurisdiction to impose a tax.

Despite today's decision, I trust this Court does not intend to say that might always makes right in the matter of taxation. I hope there is agreement, though unexpressed, that there are limits, and that our problem is to search out and mark those limits. One way to go about it is to say that those States can tax which have the physi-

cal power to do so and have conferred some benefits or protection on the taxpayer. Of course there is nothing in the Constitution about this, but that is a criticism that can be directed at any test that I can think of. My difficulty is that on its face—and as so far applied—this test comes out to the point where might does make right. For in a very real sense every State and Territory in the Union has conferred very real benefits upon every inhabitant of the Union. Some States have seen to it that our food is properly produced and inspected; others have fostered and protected the industry upon which we are utterly dependent for the ordinary conveniences of life and for life itself. All of them have yielded up men to provide government at home and to repel the enemy abroad. I am the very real debtor, but am frank enough to say I hope not a potential taxpayer, of all.

Certain it is that while only corporate stock is expressly mentioned in the opinion or involved in the judgment today, the fiction of benefits and protection is capable of as ready adaptability to other intangible property. Our tomorrows will witness an extension of the taxing power of the chartering or issuing State to corporate bonds and bonds of States and municipalities (by overruling *Farmers Loan & Trust Co.* v. *Minnesota,* 280 U. S. 204), to bank credits for cash deposited (by overruling *Baldwin* v. *Missouri,* 281 U. S. 586), and to choses in action (by overruling *Beidler* v. *South Carolina,* 282 U. S. 1). And while today the Court sustains only a death transfer tax, its theories are equally serviceable to sustain an income or excise tax, on dividends from such stock or interest on bonds, or a sales tax, or a gift tax. Whether each chartering or issuing State will be permitted to calculate its tax on some formula that will consider the total property owned by the decedent, I do not know, but in the present

trend of decision there is little restraint on such formulas. I therefore take today's decision to mean that any State may lay substantially any tax on any transfer of intangible property toward which it can spell out a conceivable legal relationship.

And since the Due Process Clause speaks with no more clarity as to tangible than as to intangible property, the question is opened whether our decisions as to taxation of tangible property are not due to be overhauled. And if the State of Utah is not denied jurisdiction over the transfer of this stock owned by a New York resident, it is difficult to see where the Court could find a basis for denying it jurisdiction to prescribe the rule of succession to it.

The Court, it seems to me, will be obliged to draw the line at which state power to reach nonresidents' estates and extraterritorial transactions comes to an end. I find little difficulty in concluding that exaction of a tax by a State which has no jurisdiction or lawful authority to impose it is a taking of property without due process of law. The difficulty is that the concept of jurisdiction is not defined by the Constitution. Any decision which accepts or rejects any one of the many grounds advanced as jurisdictional for state taxing purposes [22] will read into the Constitution an inclusion or an exclusion that is not found in its text. To read into the Constitution the Court's present concept of jurisdiction through charter granting, and to hold that it follows that the Constitution does not prohibit this tax, is to make new law quite as certainly as to adhere to the concept of jurisdiction ac-

[22] See Lowndes, State Taxation of Inheritances, 29 Michigan Law Review 850; Hine, Situs of Shares Issued under the Uniform Stock Transfer Act, 87 University of Pennsylvania Law Review 700.

cording to the decedent's domicile and to hold that the Constitution therefore does prohibit it.[23]

I am content with existing constitutional law unless it appears more plainly that it is unsound or until it works badly in our present day and society.

MR. JUSTICE ROBERTS concurs in this opinion.

---

[23] But fear of legislating need not intimidate those of either view. The necessity of eventually finding some jurisdictional basis for state action affecting nonresidents presents a problem similar to that stated by Mr. Justice Holmes in *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, 221: "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." And another candid jurist has said: "I will not hesitate in the silence or inadequacy of formal sources to indicate as the general line of direction for the judge the following: that he ought to shape his judgment of the law in obedience to the same aims which would be those of a legislator who was proposing to himself to regulate the question." Cardozo, The Nature of the Judicial Process (1932) 120.

Where prescribed sources of law fail to guide the judicial process, the Swiss Civil Code provides that the judge "must pronounce judgment according to the rule which he would set up if he were legislator himself." Williams, Sources of Law in the Swiss Civil Code (1923) 34 *et seq.;* Schoch, The Swiss Conflict of Laws, 55 Harvard Law Review 738, 749, note 57. The Swiss may have thought a candid recognition of what necessarily is the practice would forestall judicial disclaimer of responsibility for the practical consequences of law announced.