STATE, Respondent, v. VAN DAALEN, et al, Appellants

(11 N. W.2d 523.)

(File No. 8576. Opinion filed October 30, 1943.)

**Henry C. Mundt,** of Sioux Falls, **N. B. Bartlett,** of Lennox, **Hayden C. Covington,** of Brooklyn, N. Y., and **Roy A. Swayze,** of Arlington, Va., for Appellants.

**George T. Mickelson,** Atty. Gen., and **A. R. Henrikson,** Acting State's Atty., Codington County, of Watertown, for Respondent.

WARREN, J. The defendants were tried on an information presented and filed in the Municipal Court of the City of Watertown, Codington County, South Dakota. Counts I and II of the information read:

"Count I. Said defendants at and in the County of Codington, in the State of South Dakota, during the month of December, 1941, and during the month of January, 1942, did wilfully, unlawfully and feloniously engage in and transact business as retailers, without any permit to engage in or transact such business having been issued to them by the Director of Taxation of the State of South Dakota, all contrary to SDC 57.3301 and SDC 57.9924, the statute in such case made and provided, and against the peace and dignity of the State of South Dakota."

"Count II. That said defendants did engage in and transact business as retailers in the County of Codington and State of South Dakota, during the month of December, 1941, and did wilfully, unlawfully and feloniously fail, refuse and neglect to make a return of sales made by them during said month of December, 1941, to the Director of Taxation of the State of South Dakota, on or before January 15, 1942, or at all, all contrary to the provisions of SDC 57.3302 as amended by Chapter 270 of the Laws of South Dakota for the year 1939 and SDC 57.9924, the statute in such case made and provided, and against the peace and dignity of the State of South Dakota."

At the close of the evidence the defendants moved for a dismissal of the information, the motion was overruled. A jury trial having been waived, the court made its decision finding the defendants guilty as charged in the information. The defendants were sentenced to pay fines and upon failure

to pay the fines and costs were each sentenced to imprisonment in the county jail of Codington County, South Dakota, for a period of 31 days. The defendants have appealed to this court.

The appellants are members of a religious sect known as "Jehovah's Witnesses" and claim to be interested in furthering the activities of the "Jehovah's Witnesses" sect. They operated within Codington County with headquarters at Watertown, South Dakota. It would seem that each of the appellants carried a portable phonograph on which records would be played to persons who wished to listen. The phonograph records were mostly explanatory in nature, setting out the ideas and beliefs of the "Jehovah's Witnesses" sect. Each of the appellants also carried with him a number of pamphlets and books which were on occasions either sold or given away to persons who would receive them. The record shows that the reading material was both sold and given away free of charge. The appellants admitted that they had not complied with SDC §§ 57.3301, 57.9924 and § 57.3302, as amended by Ch. 270, Laws of South Dakota for 1939. Appellants' failure to comply with the above sections seems to have been wilful under their theory that their activities were not commercial in nature but were of a religious nature, and that, therefore, the requirements of the foregoing sections would deprive them of their constitutional rights to practice their religion according to their view of the interpretation of the Holy Scriptures.

In the attempt to sustain their contentions they claim that they are ordained preachers and that to compel them to submit to the law requiring a permit as retailers and making a return on the sale of books and pamphlets, would, in effect, be the same as requiring a license for the privilege of preaching the gospel. They further contend and insist that the use of the streets for sale and distribution of pamphlets is not commercial and that they are not retailers, but that their method of preaching is such that they are not amenable and did not violate the law under which they were arrested and tried, and that they are not required to

secure permits as retailers under the South Dakota law and are not compelled to make a return on the sales that were made.

The appellants' assignments of error charge that the South Dakota Retail Sales Tax Act does not apply to them as they are not retailers; that the articles disseminated were not goods, wares and merchandise when properly defined; that the charitable activity or preaching is especially exempted by Ch. 269(1) and (4), Session Laws 1939, amending SDC 57.3202; that the Retail Sales Tax Act as applied to these appellants is unconstitutional as it abridges the appellants' rights of freedom of the press and worship of Almighty God, contrary to Sections 2, 3, 4 and 5 of Art. VI, South Dakota Constitution, and that the South Dakota Retail Sales Tax Act abridges appellants' rights of freedom of press and worship of Almighty God contrary to the 1st and 14th Amendments to the United States Constitution. From the leading reported cases, we learn that the appellants' plan of operation is much the same and similar to the plan now commonly used by the "Jehovah's Witnesses" sect all over the United States.

The issues presented by this appeal have been before many courts in the past, and the decisions are not uniform and in harmony. Some of the authorities relied upon by the respondent cannot now be considered the law upon the constitutional questions herein raised for the reason that the Supreme Court of the United States on May 3, 1943, handed down its opinion in the case of Murdock v. Commonwealth of Pennsylvania (City of Jeannette), 319 U. S. 105, 63 S. Ct. 870, 872, 87 L. Ed. 1292, which conceding without deciding that, that the cited statutes were intended to apply to the activities of appellants, must necessarily dispose of the issue now before us and we quote portions thereof which are decisive and controlling:

"The First Amendment, which the Fourteenth makes applicable to the states, declares that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of

speech, or of the press * * *.' It could hardly be denied that a tax laid specifically on the exercise of those freedoms would be unconstitutional. Yet the license tax imposed by this ordinance is in substance just that.

"Petitioners spread their interpretations of the Bible and their religious beliefs largely through the hand distribution of literature by full or part time workers. They claim to follow the example of Paul, teaching 'publickly, and from house to house.' Acts 20:20. They take literally the mandate of the Scriptures, 'Go ye into all the world, and preach the gospel to every creature.' Mark 16:15. In doing so they believe that they are obeying a commandment of God.

"The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses. It has been a potent force in various religious movements down through the years. This form of evangelism is utilized today on a large scale by various religious sects whose colporteurs carry the Gospel to thousands upon thousands of homes and seek through personal visitations to win adherents to their faith. It is more than preaching; it is more than distribution of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion. It also has the same claims as the others to the guarantees of freedom of speech and freedom of the press. * * * Other claims may well arise which deserve the same fate. We only hold that spreading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types. The manner in which it is practiced at times gives rise to special problems with which the police power of the states is competent to deal * * *

"The alleged justification for the exaction of this license

tax is the fact that the religious literature is distributed with a solicitation of funds. Thus it was stated in Jones v. Opelika, supra, 316 U. S. [584] at page 597, 62 S. Ct. [1231], at page 1239, 86 L. Ed. 1691, 141 A. L. R. 514, that when a religious sect uses 'ordinary commercial methods of sales of articles to raise propaganda funds', it is proper for the state to charge 'reasonable fees for the privilege of canvassing'. Situations will arise where it will be difficult to determine whether a particular activity is religious or purely commercial. The distinction at times is vital. As we stated only the other day in Jamison v. Texas, 318 U. S. 413, 63 S. Ct 669, 672, 87 L. Ed. 869. 'The state can prohibit the use of the street for the distribution of purely commercial leaflets, even though such leaflets may have "a civil appeal, or a moral platitude" appended. Valentine v. Chrestensen, 316 U. S. 52, 55, 62 S. Ct. 920, 922, 86 L. Ed. 1262. They may not prohibit the distribution of handbills in the pursuit of a clearly religious activity merely because the handbills invite the purchase of books for the improved understanding of the religion or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes.' But the mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection plate in church would make the church service a commercial project. The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that a religious organization needs funds to remain a going concern. But an itinerant evangelist however misguided or intolerant he may be, does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him. Freedom of speech, freedom of the press,

freedom of religion are available to all, not merely to those who can pay their own way. As we have said, the problem of drawing the line between a purely commercial activity and a religious one will at times be difficult. On this record it plainly cannot be said that petitioners were engaged in a commercial rather than a religious venture. It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets. And the Pennsylvania court did not rest the judgments of conviction on that basis, though it did find that petitioners 'sold' the literature. The Supreme Court of Iowa in State v. Mead, 230 Iowa 1217, 300 N. W. 523, 524, described the selling activities of members of this same sect as 'merely incidental and collateral' to their 'main object which was to preach and publicize the doctrines of their order.' And see State v. Meredith, 197 S. C. 351, 15 S. E.2d 678; People v. Barber, 289 N. Y. 378, 385, 386, 46 N. E.2d 329. That accurately summarizes the present record.

"We do not mean to say that religious groups and the press are free from all financial burdens of government. See Grosjean v. American Press Co., 297 U. S. 233, 250, 56 S. Ct. 444, 449, 80 L. Ed. 660. We have here something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities. It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon. The tax imposed by the City of Jeannette is a flat license tax, the payment of which is a condition of the exercise of these constitutional privileges. The power to tax the exercise of a privilege is the power to control or suppress its enjoyment. Magnano Co. v. Hamilton, 292 U. S. 40, 44, 45, 54 S. Ct. 599, 601, 78 L. Ed. 1109, and cases cited. Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance. Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all

those who do not have a full purse. Spreading religious beliefs in this ancient and honorable manner would thus be denied the needy. Those who can deprive religious groups of their colporteurs can take from them a part of the vital power of the press which has survived from the Reformation.

"\* \* \* A state may not impose a charge for the enjoyment of a right granted by the federal constitution. Thus, it may not exact a license tax for the privilege of carrying on interstate commerce (McGoldrick v. Berwind-White Co., 309 U. S. 33, 56-58, 60 S. Ct. 388, 397, 398, 84 L. Ed. 565, 128 A. L. R. 876), although it may tax the property used in, or the income derived from, that commerce, so long as those taxes are not discriminatory. Id., 309 U. S. at page 47, 60 S. Ct. at page 392, 84 L. Ed. 565, 128 A. L. R. 876 and cases cited. A license tax applied to activities guaranteed by the First Amendment would have the same destructive effect. It is true that the First Amendment, like the commerce clause, draws no distinction between license taxes, fixed sum taxes, and other kinds of taxes. But that is no reason why we should shut our eyes to the nature of the tax and its destructive influence. The power to impose a license tax on the exercise of these freedoms is indeed as potent as the power of censorship which this Court has repeatedly struck down. Lovell v. Griffin, 303 U. S. 444, 58 S. Ct. 666, 82 L. Ed. 949; Schneider v. State, supra (308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155); Cantwell v. Connecticut, 310 U. S. 296, 306, 60 S. Ct. 900, 904, 84 L. Ed. 1213, 128 A. L. R. 1352; Largent v. Texas, 318 U. S. [418], 63 S. Ct. 667, 87 L. Ed. 873; Jamison v. Texas, supra. \* \* \*

"It is claimed, however, that the ultimate question in determining the constitutionality of this license tax is whether the state has given something for which it can ask a return. That principle has wide applicability. State Tax Commission v. Aldrich, 316 U. S. 174, 62 S. Ct. 1008, 86 L. Ed. 1358, 139 A. L. R. 1436, and cases cited. But it is quite irrelevant here. This tax is not a charge for the enjoyment of a privilege or benefit bestowed by the state. The privi-

lege in question exists apart from state authority. It is guaranteed the people by the federal constitution. * * *

"The judgment in Jones v. Opelika has this day been vacated. Freed from that controlling precedent, we can restore to their high, constitutional position the liberties of itinerant evangelists who disseminate their religious beliefs and the tenets of their faith through distribution of literature."

■■ Respondent argues that the two per cent tax chargeable is not excessive and that it is very reasonable, but it is, nevertheless, a tax applied to activities guaranteed to be free exercise of religion by the First Amendment and would have the same destructive effect and would hamper the exercise of the freedoms guaranteed by the Constitution. This sales tax under our statute is a privilege or occupation tax. Our court in State ex rel. Botkin et al. v. Welsh, 61 S. D. 593, 623, 624, 251 N. W. 189, 202, defines "occupation" as follows: "We think the word 'occupation,' as used in that constitutional provision, is an extremely broad term sufficient to include any business, trade, profession, pursuit, vocation, or calling. We also think that to impose a tax upon an occupation is exactly the same thing as to impose a tax upon the privilege of engaging in an occupation. The two phrases differ slightly in verbiage, but are identical in meaning." State ex rel. Sioux Falls Motor Co. v. Welsh, 65 S. D. 68, 270 N. W. 852.

We are therefore of the opinion that considering the statutes which the state claims to have been violated by the appellants fall squarely within the language interpreting the constitutional guarantee in Murdock v. Commonwealth of Pennsylvania, supra, in which only a license tax was involved. Martin v. City of Struthers, Ohio, 319 U. S. 141, 63 S. Ct. 862, 87 L. Ed. 1313; State ex rel. Singleton v. Woodruff, Fla., 13 So.2d 704. The appellants are informed against in the first count in the failure of paying the fee and obtaining the license to transact business. In the second count, with the failure to make a return of sales made by them during a certain period. Both of the counts are brought and predi-

cated upon the theory that the appellants were engaged in and pursuing an occupation without procuring a license and without reporting and paying a tax on sales made by them. This amounts to a tax upon an occupation, vocation or calling. Under the reasoning of the United States Supreme Court, which we have quoted, this cannot be sanctioned. Under its holding, the state is without authority to require the payment of the tax and impose the duty and obligation upon the appellants. It follows, therefore, that similar requirements having been held unconstitutional by the Supreme Court of the United States that the conviction cannot be sustained.

The judgment appealed from is reversed.

All the Judges concur.