CARLOS F. MARISTANY, Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellee.

No. R-65-165.     Decided April 19, 1967.

278

*Rivera Zayas, Rivera Cestero & Rúa* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Irene Curbelo, Assistant Solicitor General,* for appellee.

Mr. Justice Santana Becerra delivered the opinion of the Court.

This case involves a challenge against the power of the Commonwealth of Puerto Rico to impose and collect from

plaintiff, Dr. Carlos F. Maristany, the gift tax object of this action. The facts on which the challenge is based are the following:

Francisco Gaspar Salichs died in the State of New York, City of New York, on October 16, 1959, while he was a citizen with domicile and residence therein. He died leaving a will executed in that city on December 17, 1957. According to the fifth clause of said will, the deceased left all the remainder of his property, both real and personal, wheresoever situated, to The Hanover Bank, a New York banking corporation, in trust, for the following uses and purposes:

(a) To divide such trust property in two portions, one portion to be an amount equal to 40% of the adjusted gross estate, designated Fund No. 1, and the other portion, 60% of said value, designated Fund No. 2. He ordered the executor:

(b) To hold, manage, invest, and collect the income from said funds and to pay the net income during the life of his wife, Marguerite Graham Salichs, as follows:

(1) All the net income from Fund No. 1 to his wife for her life.

(2) The net income from Fund No. 2 to be paid and distributed among eleven persons in a particular proportion, one of those persons being plaintiff, Dr. Carlos F. Maristany, in a proportion of 15%.

(c) If his wife survived him, then upon her death, funds Nos. 1 and 2 would be distributed thus:

(1) The entire "corpus" and any accrued income thereon of Fund No. 1 would be distributed as ordered by his wife by means of a will or any other instrument, at her discretion, and in default thereof, to the beneficiaries mentioned or their successors.

(2) The entire "corpus" and any accrued income thereon of Fund No. 2 would be paid to the same beneficiaries

or to their successors already mentioned, and in the proportion designated, plaintiff being one of them.

Under the above testamentary provisions it appears that the deceased left the portion of his estate constituted under Fund No. 2 in usufruct to plaintiff and those other persons during his wife's lifetime, and at her death, they would consolidate the said portion in fee simple. When the predecessor died his wife survived him.

In addition to those stated above, the following are undisputed facts appearing from the record: (a) Fund No. 2 was constituted with securities and stock of corporations organized outside of Puerto Rico, in States of the United States. (b) Such securities and stock were never located in Puerto Rico, nor their rights thereto registered herein; neither did part of the corpus of Fund No. 2 ever constitute property located in Puerto Rico or related to Puerto Rico. (c) Plaintiff Dr. Carlos F. Maristany has always been and was, at the time of the death of the predecessor, a citizen domiciled and a resident in Puerto Rico. (d) At the time of his death the predecessor was a citizen and domiciled and a resident in the State of New York, and died under a will executed in that city.

■■ Act No. 303 of April 12, 1946—13 L.P.R.A. §§ 881 to 905 (1962 ed.)—provides in its § 2 that there shall be levied and collected on *the recipient* of every taxable gift, and the latter shall pay a tax at the rates fixed in § 3. "Taxable gift" was defined in § 1(e) as the amount of any gift minus the exemptions allowed by § 4. "Recipient," on whom the tax is imposed, was defined as *the person receiving* a gift, including heirs, legatees, and successors in interest— § 1(b).

■ The *gift* is defined in § 1(a) of Act No. 303, as amended by Act No. 49 of June 13, 1964. It includes *any* transfer in trust and *all* transfer effected by inheritance,

by will or intestacy. Section 6 of Act No. 99 of August 29, 1925, as amended by Act No. 303 of 1946, and subsequent acts, provides that whenever so ordered by the Secretary of the Treasury, all estates of decedents and all the estates granted or the object of a grant shall be assessed at the market value at the time of the death or of the donation, as the case may be. Section 14 of said Act No. 99 of 1925, also amended by Act No. 303 of 1946, and No. 189 of May 13, 1948, establishes that the word "property" shall be construed to include both "real" and "personal estate" and "any form of interest therein," including life incomes or annuities of any form or kind, "as well as *usufruct*, nude property *or any kind of rights and actions.*"

Plaintiff does not challenge the lack of authority at law of the Secretary of the Treasury to levy the tax in question in the light of the statutory provisions copied above. Nor does he challenge the manner or method in which the Secretary determined the amount of the tax imposed. We cannot disregard then the constitutional attack he makes against the power itself of the Commonwealth of Puerto Rico to require this tax before a situation of facts like the one at bar. He sustains that the tax is unconstitutional:

(a) Because the transfer of the rights of plaintiff occurred as a result of the death of his uncle, a citizen of the State of New York, domiciled therein and protected by the laws of said State. (b) The rights acquired by plaintiff have been over securities and capital stock of corporations established in the United States and outside of Puerto Rico, which have not done business here. (c) Said securities and stock have never been within the jurisdiction of the Commonwealth of Puerto Rico nor did they require any law of Puerto Rico to protect their transfer. (d) Puerto Rico cannot constitutionally levy the tax on plaintiff because it has not granted him any right, protection or privilege regarding the transfer and acquisition of the rights he obtained under the

laws of the State of New York, because of the testamentary acts executed in that State. (e) The transfer to the taxpayer of the securities and stock not having depended on the laws of Puerto Rico, nor these laws having offered any protection as to said transfer, plaintiff maintains that the tax levied is null, void and illegal, and deprives him of his property without due process of law.

The sovereign power of the Commonwealth of Puerto Rico to levy and collect taxes for its subsistence and other public and social purposes has no other limitation than those of its own Constitution, and several other provisions of the Puerto Rican Federal Relations Act, which are not involved in this case.[1] The Constitution of the Commonwealth of Puerto Rico provides that no person shall be deprived of his liberty or property without due process of law, and no person in Puerto Rico shall be denied the equal protection of the laws—Art. II, § 7—; and Art. VI, § 3—that the rule of taxation in Puerto Rico shall be uniform. In considering plaintiff's contention in the light of the guarantee offered by the Commonwealth of Puerto Rico of not being deprived of his property without due process of law, the standards of maximum protection established by the Supreme Court of the United States in similar constitutional cases are in order as minimum guarantees. The reason is obvious.[2]

---

[1] Public Law 600, § 4, 64 Stat. 319.

[2] Public Law No. 87–189 of August 30, 1961, 75 Stat. 417, 28 U.S.C.A. § 1258, establishes a jurisdiction for the review by the Supreme Court of the United States of the final judgments of this Court, identical to that established for the review of the final judgment of the States—28 U.S.C.A. § 1257. In its original text § 1258 establishes:

"Final judgments or decrees rendered by the Supreme Court of the Commonwealth of Puerto Rico [Sec. 1257—by the highest court of a State in which a decision could be had] may be reviewed by the Supreme Court as follows:

"(1) By appeal, where is drawn in question the validity of a treaty or statute of the United States and the decision is against its validity.

"(2) By appeal, where is drawn in question the validity of a statute of the Commonwealth of Puerto Rico on the ground of its being repugnant

Plaintiff invokes *Freeman* v. *Secretary of the Treasury*, 82 P.R.R. 298 (1961), as his fundamental support for the position assumed herein. *State Tax Comm'n* v. *Aldrich*, 316 U.S. 174; *Wisconsin* v. *J. C. Penney Co.*, 311 U.S. 435, and *Treichler* v. *Wisconsin*, 338 U.S. 251; the three other decisions he cites in his memorandum submitting the case do not help him at all as we shall see. In the *Freeman* case we dealt with the transfer mortis causa, outside of Puerto Rico, of intangibles—certificates of corporative capital stock—of a citizen and resident of the State of Michigan, to another citizen of Michigan also domiciled and resident therein. Regarding Puerto Rican citizenship, that was a transfer between foreigners. The stock certificates were not physically located in Puerto Rico either.

The authority of Puerto Rico to collect, in that situation, the gift tax imposed by Act No. 303 of 1946 on that portion of the estate represented by said stock certificates was upheld fundamentally, by reason of the fact that they were stock certificates of the corporative capital of a corporation organized under the laws of Puerto Rico, which was doing business here. It was said, making reference to certain applicable provisions of a *regulatory* type of the Corporation Act of 1911—see footnote 7, 82 P.R.R. 308—that there was no doubt that the transfer of the shares in favor of the taxpayer therein would be effected in accordance with the local law for private corporations, and we must presume that *record* of the transfer of shares shall be done here consistent

to the Constitution, treaties, or laws of the United States, and the decision is in favor of its validity.

"(3) By writ of certiorari, where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of the Commonwealth of Puerto Rico is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution, treaties, or statutes of, or commission held or authority exercised under, the United States. Added Pub. L. 87–189, § 1, August 30, 1961, 75 Stat. 417."

with the provisions of the Corporation Act of 1911 (p. 308).[3]

The Court of Appeals upheld the tax levy in the case of *Freeman* v. *Ramon Noguera,* 299 F.2d 767 (1st Cir. 1962), with this brief statement and citation at p. 768:

"Appellant is the widow and sole heir of the decedent. She and decedent resided at all times in the state of Michigan, where the shares of stock whose transfer is sought to be taxed were physically located. The constitutional power of Puerto Rico to impose this death duty is unquestioned. State Tax Commission of Utah v. Aldrich, 1942, 316 U.S. 174, 62 S.Ct. 1008, 86 L.Ed. 1358."

The case before us involves a different fundamental and very important factor to the constitutional question raised, which is the Puerto Rican citizenship of plaintiff, Dr. Maristany, and his permanent domicile and residence here. This factor, on which no pronouncement was necessary in the *Freeman* case, inasmuch as it was not involved therein and which plaintiff either ignores or disregards in his discussion of the problem in spite of its obvious importance, obliges us to project the issue towards another area of the constitutional doctrine applicable.

■■ It has been said that the name given to a tax lacks importance and that its very substance is fixed rather by its incidence; and that when there is controversy as to whether a tax contravenes guaranteed constitutional rights, it is not its form nor its definition or interpretation which decides the case, but its practical effect or the consequence of said tax as a question of reality in its application and operation. *Cf. Shaffer* v. *Carter,* 252 U.S. 37; *Dawson* v. *Kentucky Dis-*

---

[3] The reference is to § 20 of the Corporation Act of 1911 to the effect that every corporation organized under it would keep at its principal office here transfer *books* in which the transfer of shares of stock would be registered, and stock books which shall contain the names and addresses of the stockholders, to be examined by any stockholder, and the secretary of the corporation shall be bound to transmit monthly to the Secretary of the Treasury a statement showing the transfer of shares of stock made.

*tilleries & Warehouse Co.*, 255 U.S. 288; *Richfield Oil Corp.* v. *State Board of Equalization*, 329 U.S. 69; *Wisconsin* v. *J. C. Penney Co.*, 311 U.S. 435; *Commissioner* v. *Hansen*, 360 U.S. 446, 461. The taxing power being inherent to the State and the means by which the government distributes the burdens of its cost among those who enjoy its benefits, *Welch* v. *Henry*, 305 U.S. 134, 144, the tax contingencies must be considered with the practical sense of the realities involved, *cf. Helvering* v. *F. & R. Lazarus & Co.*, 308 U.S. 252, without legal fictions and subtleties getting much into play. *Cf. Tyler* v. *United States*, 281 U.S. 497; *R.C.A.* v. *Government of the Capital*, 91 P.R.R. 404 (1964). We must always look for the reality involved.

█ Let us see what is actually the imposition made herein. Obviously, this is not a case of property tax on personal property, whether corporeal or incorporeal, as may be that which constitutes the "corpus" of the trust fund related with this case. The value of the gift is considered only as a part of a mechanism to fix in a logical and reasonable manner the *amount* of the tax, but the gift in itself is not taxed. It is clearly a tax of a *personal* nature, levied and collected on the person who becomes a *donee* for having received a gift—§§ 1(b) and 2, Act No. 303. That is the taxable incident or event: the *receipt* of a gift. According to § 1, it is the *receipt* of a thing by a person by virtue of an act of liberality—Civil Code, § 558, 1930 ed.; the receipt by the person of property for less than its fair value; the receipt of the pecuniary benefit produced by the total or partial condonation of an obligation or debt of his; the receipt of the amount of an ordinary life or endowment insurance policy if the premiums have not been paid by said person; the receipt of certain amounts from the Retirement Fund of the Employees of the Government of Puerto Rico and other agencies and of the federal system, as benefits for the

death of a participant; the direct or indirect receipt of property in trust; the receipt of property of a decedent.[4]

■ Nobody would dare question the fact that the gradual and lucrative increase of the property and wealth of a person by means of *the receipt* of a gift constitutes a socio-economic event upon which the State can legitimately exercise its encompassing taxing power over that person. It is unquestionable also that in the exercise of said power there should exist, from the viewpoint of the applicable constitutional limitations, some rational relation between the taxing State and the subject or object of the tax.

■ That relation exists in the case before us. It is the Puerto Rican citizenship of taxpayer Dr. Maristany and his permanent domicile and residence in Puerto Rico before and at the exact moment of receiving the gift. This citizenship and residence is in the political order the relation by excellence—comparable to the family relation in another order— which binds juridically the Commonwealth of Puerto Rico with plaintiff in the exercise of all its sovereign powers, among them the fundamental power of levying taxes, and binds plaintiff to said sovereign powers.[5]

---

[4] Compare the statements of the legislator upon making the imposition in Act No. 303: "There shall be levied and collected *on the recipient of every taxable gift and the latter shall pay . . . .*" "Recipient means the person *receiving* a gift . . ." with his statement in the imposition made in Act No. 99 of 1925, substituted by the former, as amended in 1936 by Act No. 72: "All real property within Puerto Rico and any interest therein belonging to residents or nonresidents in Puerto Rico or outside of Puerto Rico; all personal property in Puerto Rico or outside of Puerto Rico belonging to residents in Puerto Rico; and all personal property in Puerto Rico belonging to persons not residing in Puerto Rico, which passes by will, intestacy, inheritance or donation, the intention of which is to grant the possession, nude ownership, or usufruct, after the death of the grantor, to any person, association, institution or corporation, in trust or otherwise, shall be subject to a tax as hereinafter provided."

[5] Although only by way of illustration and merely to show how strong is the relation of citizenship in the exercise by the State of its political powers, see *Cook* v. *Tait*, 265 U.S. 47 (1924). The taxpayer was a citizen

■ In *Lawrence* v. *State Tax Comm.*, 286 U.S. 276 (1932), a case which in its 35 years is often cited by the Supreme Court itself as an illustrative and guiding case in these controversies, the tax levied by the State of Mississippi on income derived from activities outside of said State was challenged by a citizen and resident of Mississippi. Upon upholding the tax, Mr. Justice Stone declared at p. 279:

"The obligation of one domiciled within a state to pay taxes there, arises from unilateral action of the state government in the exercise of the most plenary of sovereign powers, that to raise revenue to defray the expenses of government and to distribute its burdens equably among those who enjoy its benefits. *Hence, domicile in itself establishes a basis for taxation.* Enjoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, *are inseparable* from the responsibility for sharing the costs of government. [Citations.] . . .

"The present tax has been defined by the Supreme Court of Mississippi as an excise and not a property tax [citations], but in passing on its constitutionality we are concerned only with

---

of the United States but had his *permanent* residence and domicile in Mexico. His income from property located in Mexico was taxed. Both the property and the income and the taxpayer himself were permanently outside of the territorial jurisdiction of the United States. The only relation was that of citizenship.

Sustaining the federal tax imposed, the Supreme Court of the United States, after referring to the taxing powers of the United States and of that of the States, as such, said:

"In other words, the principle was declared that the government, by its very nature, benefits the citizen and his property, wherever found, and therefore has the power to make the benefit complete. Or, to express it another way, the basis of the power to tax was not and cannot be made dependent upon the *situs* of the property in all cases, it being in or out of the United States, nor was not and cannot be made dependent upon the domicil of the citizen, that being in or out of the United States, *but upon his relation as citizen to the United States, and the relation of the latter to him as citizen.*" (Italics ours.)

We are conscious of the fact that the Supreme Court has, for the several states, qualified additional requirements necessary to the problem of the adjustment of political and economic interest characteristic of the federal system.

its practical operation, not its definition or the precise form of descriptive words which may be applied to it." (Citations.)

Mr. Justice Stone continues at p. 280:

"It is enough, so far as the constitutional power of the state to levy it is concerned, that the tax is imposed by Mississippi on its own citizens with reference to the *receipt and enjoyment* of income derived from the conduct of business, regardless of the place where it is carried on. The tax, which is apportioned to the ability of the taxpayer to bear it, *is founded upon* the protection afforded to the *recipient* of the income by the state, in his person, in his right *to receive the income, and in his enjoyment of it* when received. These are rights and privileges incident *to his domicile in the state* and to them the *economic interest realized* by the *receipt* of income or represented by the power to control it, bears a direct legal relationship." (Italics ours.)

*Curry* v. *McCanless*, 307 U.S. 357 (1939), presents the case of a resident, domiciled in Tennessee, who transferred in trust to a corporation in Alabama, as fiduciary, certain intangible property—stock and bonds—with instructions of administering the trust and having the income paid to her during her lifetime. By testamentary provision at her death said trust passed to the same fiduciary corporation who had it for the benefit of her husband and children. Discarding the theory that the Fourteenth Amendment fixes only one "situs" of the intangible property for its taxation, and sustaining the right of both Tennessee and Alabama, to impose an inheritance tax on the trust in spite of the fact that the latter was always situated physically in Alabama, the Supreme Court, after referring to all those other rules which govern the taxation of the tangible property by the State, stated the following at p. 365:

"Very different considerations, both theoretical and practical, apply to the taxation of intangibles; that is, rights which are not related to physical things. Such rights are but *relationships between persons,* natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in courts. The

power of government over them and the protection which it gives them cannot be exerted through control of a physical thing. They can be made effective only through *control over and protection afforded to those persons* whose relationships are the origin of the rights. [Citations.] Obviously, as sources of actual or potential wealth—which is an appropriate measure of any tax imposed on ownership or its exercise—they cannot be dissociated from the persons *from whose relationships they are derived.* These are not in any sense fictions. They are indisputable realities.

"The power to tax 'is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation.' *McCulloch* v. *Maryland,* 4 Wheat. 316, 429 . . . . From the beginning of our constitutional system *control over the person at the place of his domicile* and his duty there, common to all citizens, to contribute to the support of government have been deemed to afford an adequate constitutional basis for imposing on him a tax on the use and enjoyment of rights in intangibles measured by their value." (Italics ours.) See: *Graves* v. *Elliott,* 307 U.S. 383.

Perhaps a more elaborate exposition would not be necessary, were it not for the fact that plaintiff, in the discussion of the problem, appears not to give significance or importance at all to this very basic fact of the citizenship of Puerto Rico and the domicile of Dr. Maristany, in the constitutional challenge he makes against the tax levied on him. Let us analyze briefly other decisions which complete the constitutional picture.

Kentucky levied tax on the property of a corporation of that State as owner of vessels sailing between New York and other state ports, and Cuba. The ships were enrolled in New York and the latter name was marked upon the stern. The property was always outside of the territorial jurisdiction of Kentucky. Sustaining this tax in *Southern Pacific Co.* v. *Kentucky,* 222 U.S. 63 (1911), the Supreme Court stated at p. 68:

"The ancient maxim which assigns to tangibles, as well as intangibles, the *situs* of the owner for purposes of taxation has its foundation in the protection *which the owner receives from the government of his residence,* and the exception to the principle is based upon the theory that if the owner, by his own act, gives to such property a *permanent* location elsewhere, the *situs* of the domicile must yield to the actual *situs* and resulting dominion of another government . . . ." (Italics ours.)

And then at p. 76:

"The legality of a tax is not to be measured by the benefit received by the taxpayer, although equality of burdens be the general standard sought to be attained. Protection and taxation are not necessarily correlative obligations, nor precise equality of burden attainable, however desirable. The taxing power is one which may be interfered with upon grounds of unjustness only when there has been such flagrant abuse as may be remedied by some affirmative principle of constitutional law."

In a situation in which Kentucky levied on a person domiciled there a tax on the bank deposits the person had in Missouri and which were the product of the businesses said person had in the latter State, Mr. Justice Holmes, in sustaining the tax, states in *Fidelity & Columbia Tr. Co.* v. *Louisville,* 245 U.S. 54, 58 (1917):

"So far as the present decision is concerned we may concede without going into argument that the Missouri deposits could have been taxed in that State, under the decisions of this court. [Citations.] But liability to taxation in one State does not necessarily exclude liability in another. [Citations.] The present tax is a tax *upon the person,* as is shown by the form of the suit, and is imposed, it may be presumed, *for the general advantages of living within the jurisdiction.* These advantages, if the State so chooses, may be measured more or less by reference to the riches of the person taxed. Unless it is declared unlawful by authority we see nothing to hinder the State from taking a man's credits into account. But so far from being declared unlawful, it has been decided by this court that whether a State shall measure the contribution by the value of such credits and choses in action, not exempted by superior authority, is the

State's affair, not to be interfered with by the United States, and therefore that a State may tax a man for a debt due from a resident of another State." (Citations.)

In *Burnet* v. *Wells*, 289 U.S. 670 (1933), tax was imposed on the income of a trust which according to its own constitution was to be used by the fiduciary to pay insurance premiums in favor of other persons. Mr. Justice Cardozo, upon sustaining the tax, stated at p. 678:

"Liability does not have to rest upon the enjoyment by the taxpayer of all the privileges and benefits enjoyed by the most favored owner at a given time or place. [Citations.] Government in casting about for proper subjects of taxation is not confined by the traditional classification of interests or estates. It may tax not only ownership, but any right or privilege that is a constituent of ownership. . . . 'Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed—the actual benefit for which the tax is paid.' " (Citations.)

The discussion in *N.Y. ex rel. Cohn* v. *Graves*, 300 U.S. 308 (1937), is rather illustrative. The problem was whether a State, New York, could constitutionally tax a resident on income obtained by the latter derived from rents of property located outside the State and on interest from banks situated outside secured by mortgages on property also outside. Sustaining the tax it was said at pp. 312–313:

"That the receipt of income by a resident of the territory of a taxing sovereignty is a taxable event, is universally recognized. *Domicil itself affords a basis for such taxation.* Enjoyment of the privileges of *residence* in the state and the attendant right *to invoke* the protection of its laws are *inseparable* from responsibility for sharing the costs of government. 'Taxes are what we pay for civilized society . . . .'

". . . Neither the privilege nor the burden is affected by the character of the source from which the income is derived."

See *Guaranty Trust Co.* v. *Virginia*, 305 U.S. 19, 23 (1938), where a similar tax was sustained by the State of domicile and residence, Virginia, notwithstanding the fact that the

same income was taxed by New York in the hands of the fiduciary. "Here, the thing taxed was *receipt* of income within Virginia by a citizen residing there." *Texas* v. *Florida*, 306 U.S. 398 (1939), with an ample discussion on the concept of domicile.

Rhode Island levied property tax on half of a trust of intangible property located outside of the State and jointly owned by two fiduciaries, one resident of that State and the other a foreigner. Mr. Justice Reed states at p. 492, in *Greenough* v. *Tax Assessors*, 331 U.S. 486 (1947):

"The precedents, holding it unconstitutional for a state to tax tangibles of a resident that are *permanently* beyond its boundaries, have not been applied to intangibles where the documents of owner interest are beyond the confines of the taxing jurisdiction or where the choses in action are mere promises of a nonresident without documents. . . . A state is dependent upon its *citizens* for revenue. Wealth has long been accepted as a fair measure of a tax assessment. As a practical mode of collecting revenue, the states unrestricted by the federal Constitution have been accustomed to assess property taxes upon intangibles 'wherever actually held or deposited,' belonging *to their citizens* and regardless of the location of the debtor. So long as a state chooses to tax the value of intangibles as a part of a taxpayer's wealth, the location of the evidences of ownership is immaterial." (At p. 493.) ". . . This close *relationship* between the intangibles and the owner furnishes an adequate basis for the tax on *the owner* by the state *of his residence* as against any attack for violation of the Fourteenth Amendment. The state of the owner's residence supplies the owner with the benefits and protection inherent in the existence of an organized government. . . . It is the *place* where he exercises certain privileges of citizenship and enjoys the protection of his domiciliary government."

(At p. 490.) "For the purpose of the taxation of *those resident within her borders*, Rhode Island has sovereign power unembarrassed by any restriction except those that emerge from the Constitution." (Italics ours.)

*Ott* v. *Mississippi Barge Line*, 336 U.S. 169 (1949), where

a tax levied by Mississippi on foreign corporations in interstate commerce operating a business of freight barges which passed that State was sustained. The barges were enrolled in ports outside Mississippi and called at that State just to load and unload. The tax was imposed in the proportion the mileage of the trip within the State had with the total mileage covered in said interstate commerce. Sustaining the tax it is said at p. 174: "So far as due process is concerned the only question is whether the tax in practical operation has *relation* to opportunities, benefits, or protection conferred or afforded by the taxing State." (Citation.) See: *Northwest Airlines* v. *Minnesota*, 322 U.S. 292; *Braniff Airways* v. *Nebraska Board*, 347 U.S. 590.

*Bode* v. *Barrett*, 344 U.S. 583, 585 (1953):

"No showing has been made by any of the appellants that the tax bears no reasonable relation to the use he makes of the highways in his intrastate operations . . . . The power of a state to tax, basic to its sovereignty, *is limited only if in substance and effect it is the exertion of a different and a forbidden power* [citation] *as for example the taxation of a privilege protected by the First Amendment."* (Douglas) (Italics ours.)

In *Central R. Co.* v. *Pennsylvania*, 370 U.S. 607 (1962), Pennsylvania levied a tax on all the freight cars of a domestic corporation. Part of those freight cars were used by a corporation in New Jersey on the latter's tracks and by other corporations throughout the country. Upon sustaining the tax which included these freight cars outside the jurisdiction and not used in Pennsylvania, Mr. Justice Harlan says at p. 612:

"Nor does the Due Process Clause confine the domiciliary State's taxing power to such proportion of the value of the property being taxed as is equal to the fraction of the tax year which the property spends within the State's borders. *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U.S. 194, held only that the Due Process Clause prohibited ad valorem taxation by the owner's domicile of tangible personal property *permanently*

[italics in the original] located in some other State. *Northwest Airlines, Inc.* v. *Minnesota,* 322 U.S. 292, reaffirmed the principle established by earlier cases that tangible property for which *no* [italics in original] tax *situs* has been established elsewhere may be taxed to its full value by the owner's domicile. [Citations.] If such property has had insufficient contact with States other than the owner's domicile to render any one of these jurisdictions a 'tax situs,' it is surely appropriate to presume that the *domicile* is the only State affording the 'opportunities, benefits, or protection' which due process demands as a prerequisite for taxation."

See: *Graves* v. *Schmidlapp,* 315 U.S. 657 (1942).

*Wisconsin* v. *J. C. Penney Co.,* 311 U.S. 435 (1940) and *State Tax Comm'n* v. *Aldrich,* 316 U.S. 174 (1942) two of the three Supreme Court cases invoked by plaintiff in support of his challenge are, on the contrary, faithful exponents of the constitutional doctrine set forth in the authorities cited. In *Penney,* the Court sustained the validity of a tax levied by Wisconsin on a Delaware corporation with main offices in New York, for the privilege of declaring and receiving dividends of income derived from businesses in Wisconsin. The taxable event of declaring dividends was performed in that case outside of this State. Mr. Justice Frankfurter stated at p. 445:

"The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction. [Citations.]

"This analysis is merely a reformulation of the classic approach of this Court to the taxing power of the states." (Citation.)

". . . Nothing can be less helpful than for courts to go beyond the *extremely limited* restrictions that the Constitution places upon the states and to inject themselves in a merely negative way into the delicate processes of fiscal policy-making. We must be on guard against imprisoning the taxing power of the states within formulas that are not compelled by the Constitution but merely represent judicial generalizations exceeding the concrete

circumstances which they profess to summarize." (Italics ours.)

The *Aldrich* case is a frank reaffirmation of *Curry* v. *McCanless, supra,* and definitively sanctions, upon overruling *First National Bank* v. *Maine,* 284 U.S. 312, and actually reinstating, in its juridical force, the majority criterion of Mr. Justice Holmes in *Blackstone* v. *Miller,* 188 U.S. 189 (1903),[6] the power of the State of the domicile and residence of a person to tax him regarding his intangible property, although by other events another State can also levy tax on them.

Finally, *Treichler* v. *Wisconsin,* 338 U.S. 251, the other case cited by plaintiff, does not help him either. The Supreme Court decided that a tax as it was applied by the Supreme Court of Wisconsin in this case was a tax on the property based in part on the value of *tangible* property located in other states and, as thus applied, was contrary to the Due Process Clause of the Fourteenth Amendment. This case follows the classical doctrine which does not allow a state to tax *tangible* property with *situs* permanently outside of its jurisdiction. It does not affect the case at bar, where we deal with an interest or relation with intangible property.

The constitutional doctrine analyzed leaves no doubt as to the fact that the State of domicile and residence of a person has with precedence, just for the reason of being such domicile and residence, the unlimited power to tax said person even though, under particular circumstances, another State could also tax it; and that the State of the domicile and residence has no other constitutional limitations under the Due Process Clause than its estoppel to tax a resident and domiciled for the *tangible* property, whether personal or real, owned and located *permanently* outside of its territorial frontiers or, when, as expressed by Mr. Justice Douglas, in *Bode* v. *Barrett, supra,* "in substance and

---

[6] Overruled by *Farmers Loan Co.* v. *Minnesota,* 280 U.S. 204.

effect it is [the power of a state to tax] the exertion of a different and a forbidden power, as for example, the taxation of a privilege protected by the First Amendment."

In the case before us the statute is clear. Its express language imposes a tax on the recipient of a gift. It does not impose it on the donor for his act of transferring property or rights, but on the *recipient* for the privilege of receiving them. *Veve* v. *Secretary of the Treasury*, 78 P.R.R. 695, 699 (1955); *Descartes* v. *Tax Court*, 79 P.R.R. 128, 131 (1956), applying the Act of 1925, whose language on the taxing of the recipient was not as accurate as that of Act No. 303; *Silva* v. *Secretary of the Treasury*, 86 P.R.R. 315, 324 (1962): "The method prevailing here is not to tax the right to transfer the totality of the hereditary estate, but to tax the right or privilege of each heir . . . *to receive* his liquid or individual share." It has thus been interpreted also when construing statutes which, unlike ours, do not mention specifically the recipient in the taxing and speak of transfer. *Cf. State* v. *Wagner*, 46 N.W.2d 676 (Minn. 1951); *McLaughlin* v. *Green*, 69 A.2d 289 (Conn. 1949); *Whorff* v. *Johnson*, 58 A.2d 553 (Me. 1948); *Re Kohrs*, 199 P.2d 856 (Mont. 1948).

The direct taxing of the statute on the recipient leaves no doubt as to the taxable event, aside from the fact that under our law a transfer does not always occur, as in the condonation of a debt, or of the receipt of a life or endowment policy, or in the case of the receipt of a death benefit of a participant in a retirement fund system. Compare in another sense: *Heirs of Simon Shefftz* v. *Secretary of the Treasury*, 93 P.R.R. 868 (1967).

If plaintiff's contention were sustained, we would have to sustain equally that Puerto Rico lacks the constitutional power to tax a citizen of the island, domiciled and resident here, for income received, derived from businesses carried on outside or from property, real or personal, per-

manently located outside of its territorial jurisdiction, under the theory that Puerto Rico offers no protection or guarantee[7] to those businesses or property. It has been decidedly held that such constitutional power exists. *Lawrence* v. *State Tax Comm.*, *supra*, and subsequent cases cited. To say that Puerto Rico does not offer anything to the taxpayer in exchange for the tax it collects is to attempt to ignore the fact that Puerto Rico offers to plaintiff, a citizen domiciled and resident herein, the general advantages and benefits of living within its jurisdiction under an organized government which protects his person, his interests, and the enjoyment of the property he receives related to the tax.

The tax levied herein having been examined in the light of the Due Process Clause of the Constitution of the Commonwealth of Puerto Rico, considering it as it has been applied by the Supreme Court of the United States in similar situations, the tax in issue is clearly constitutional.

The Superior Court, San Juan Part, dismissed the taxpayer's complaint. Its judgment will be affirmed.

Mr. Justice Blanco Lugo did not participate.

---

[7] Income Tax Act of Puerto Rico, Act No. 91 of 1954, § 22(a), (b)(8); § 116(a)(1), (2).