IN THE MATTER OF THE TRANSFER INHERITANCE TAX ASSESSMENT IN THE ESTATE OF MARIA MC ILVAINE GILLMORE, DECEASED.

CHEMICAL BANK NEW YORK TRUST COMPANY, *ET AL.*, EXECUTORS, *ETC.*, APPELLANTS, v. WILLIAM KINGSLEY, ACTING DIRECTOR, *ETC.*, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 8, 1968—Decided May 22, 1968.

Before Judges GOLDMANN, KILKENNY and CARTON.

*Mr. Vincent D. Manahan, III* argued the cause for appellants (*Messrs. Herrigel, Bolan & Herrigel,* attorneys).

*Mr. Jeffrey R. Lowe,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

CARTON, J. A. D. Challenged on this appeal is a determination by the Transfer Inheritance Tax Bureau that the estate of Maria McIlvaine Gillmore, who died at a nursing home in Summit, New Jersey, on January 12, 1965 was subject to a transfer inheritance tax. The Bureau defends the imposition of the tax on the basis that decedent was a resident of this State within the meaning of the Transfer Inheritance Tax Act (*N. J. S. A.* 54:34–1 *et seq.*).

Appellants are her brother, Francis S. McIlvaine, and Chemical Bank New York Trust Company, executors of decedent's will which has been admitted to probate in New York. McIlvaine and his family are the principal beneficiaries under that will. They contend that Mrs. Gillmore was incompetent by reason of senility when she departed from New York in 1963 and never surrendered or lost her domicile in that state so as to subject her estate to taxation by New Jersey. In this connection we note that an estate tax of $17,000 has been paid by appellants to the State of New York.

The factual genesis of the present controversy is quite clear. Early in April 1963 Mrs. Gillmore's practical nurse, Mae Scharf, telephoned Francis McIlvaine from decedent's apartment at 124 East 84th Street, New York City, to advise that she could not adequately take care of her. In response to the telephone call Francis drove to New York on April 14, 1963 and took his sister to his home at Summit, New Jersey. Francis was her closest living relative and her sole next of kin. On April 30 decedent was placed in the Evergreen Nursing and Convalescent Home in Summit where

she remained until her death in 1965. Shortly after taking his sister to Summit, Francis arranged, during the summer of 1963, for the removal of the furniture from her New York apartment and the payment of the rent for the lease expiring on September 30.

In July 1963 Francis filed a verified complaint in the Superior Court, Chancery Division (Union County), seeking to have his sister adjudged a mental incompetent and requesting the grant of letters of guardianship to him. In that complaint he stated that he was domiciled and had his residence at 264 Oak Ridge Avenue, Summit. After averring that he was the brother of decedent, whom he described as "domiciled and who has had her address at 264 Oak Ridge Avenue, Summit" and "is presently residing at the Evergreen Nursing Home, Evergreen Road, Summit," the complaint recited that decedent had been a widow since 1912; there were no children of her marriage; her mother and father were dead; she had no brothers or sisters other than plaintiff, and she owned no real property but had a checking account in the Chemical Bank New York Trust Company with an approximate balance of $1300, as well as a custodian account in the same bank with an approximate market value of $350,000.

At a hearing in the incompetency proceeding held on August 20, 1963 plaintiff's medical witness expressed the opinion that decedent was mentally incompetent by reason of cerebral arteriosclerosis and/or senility; she was incapable of taking care of herself or her property; her prognosis was poor and her condition incurable. Francis testified that he lived in Summit and further stated that she resided with him in Summit prior to her entering the nursing home. Later in the hearing the following transpired:

"BY THE COURT:

Q. Mr. MacIlvaine [sic], how long was your sister living with you in Summit? A. Two or three weeks.

MR. DRUMMOND [Francis McIlvaine's attorney]: She had had an apartment, your Honor. She gave it up because she was losing all—with the loss of memory she moved in with her brother in

Summit and then the condition got worse and then she was placed into the nursing home.

THE COURT: Only been here two or three weeks?

MR. DRUMMOND: Yes, sir.

THE COURT: She has her domicile in New Jersey?

MR. DRUMMOND: Yes, sir.

THE COURT: All right."

An order was entered in the Chancery Division on August 26, 1963 adjudging decedent incompetent and appointing her brother guardian of her person and property. He duly qualified. Pursuant to an order of the court, the Trust Company of Morris County accepted for deposit the securities in the New York custodian account.

On the basis of the foregoing the Transfer Inheritance Tax Bureau determined that decedent was a domiciliary of New Jersey. A payment of $62,562 on account of any tax due was received on January 6, 1966. Apparently prompted by appellant's protest as to the finding that decedent was a New Jersey domiciliary, the Bureau took the testimony of Francis McIlvaine and his wife Irene on April 27, 1966 on this subject. The testimony at that hearing will be commented on hereafter.

On August 31, 1966 the Bureau sent appellants a final statement of the amount of tax found due, along with a detailed statement outlining the basis of the Bureau's determination. This appeal followed.

The Bureau supports the validity of the assessment on two theories: (1) an inheritance tax can be assessed against the transfer of decedent's intangible assets as a resident of this State, although not domiciled here, and (2) such a tax can be assessed because decedent was actually domiciled here.

The argument that residence alone will support the tax is based upon the provision of *N. J. S. A.* 54:34–1, which authorizes the imposition of a tax upon the transfer of real or intangible personal property wherever situated where the transfer is from a "resident of this State dying seized or possessed thereof."

An inheritance tax, like other death duties, rests "upon the principle that death is the 'generating source' from which the authority to impose such taxes takes its being." 28 *Am. Jur., Inheritance, Estate & Gift Taxes*, § 9 (1940). Such a tax is imposed under the power of a state to make reasonable regulations for the devolution of property upon the death of the owner. See *Neilson v. Russell*, 76 *N. J. L.* 655, 659 (*E. & A.* 1908).

The argument proceeds that any number of states may constitutionally impose an inheritance tax upon the same intangible property. Thus, two or more states may assess death taxes on a decedent's intangibles upon a judicial determination that the decedent was domiciled therein. *State of Texas v. State of Florida*, 306 *U. S.* 398, 410, 59 *S. Ct.* 563, 83 *L. Ed.* 817, 827 (1939). See Annotation, 121 *A. L. R.* 1200 (1939), where the cases are collected.

Proceeding from this premise, the Bureau advances the proposition that although domicile is a valid basis for the imposition of such a tax, it does not provide the exclusive basis for taxation and that residence alone may provide a sufficient platform from which the State may project this sovereign power. The theory is that when a decedent's person or property comes within the reach of a state through residence there and the state has afforded protection and extended benefits to that person, it has the constitutional power to tax. The Bureau asserts that the State may thus demonstrate the practical fact of its power as a sovereign. See *State Tax Commission of Utah v. Aldrich*, 316 *U. S.* 174, 178–179, 62 *S. Ct.* 1008, 86 *L. Ed.* 1358, 1369 (1941).

This concept finds cogent expression in the following excerpt from the court's opinion in *Curry v. McCanless*, 307 *U. S.* 357, 59 *S. Ct.* 900, 83 *L. Ed.* 1339 (1939):

"The power to tax 'is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation.' * * * From the beginning of our constitu-

tional system control over the person at the place of his domicile and his duty there, common to all citizens, to contribute to the support of government have been deemed to afford an adequate constitutional basis for imposing on him a tax on the use and enjoyment of rights in intangibles measured by their value. Until this moment that jurisdiction has not been thought to depend on any factor other than the domicile of the owner within the taxing state, or to compel the attribution to intangibles of a physical presence within its territory, as though they were chattels, in order to support the tax. * * *

* * * But when the taxpayer extends his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property within the reach of the tax gatherer there, the reason for a single place of taxation no longer obtains, and the rule is not even a workable substitute for the reasons which may exist in any particular case to support the constitutional power of each state concerned to tax. Whether we regard the right of a state to tax as founded on power over the object taxed, as declared by Chief Justice Marshall in McCulloch v. State of Maryland, 4 Wheat. 316, 4 L. Ed. 579, supra, through dominion over tangibles or over persons whose relationships are the source of intangible rights, or on the benefit and protection conferred by the taxing sovereignty, or both, it is undeniable that the state of domicile is not deprived, by the taxpayer's activities elsewhere, of its constitutional jurisdiction to tax, and consequently that there are many circumstances in which more than one state may have jurisdiction to impose a tax and measure it by some or all of the taxpayer's intangibles." (at *pp.* 366–368, 59 *S. Ct.*, at *p.* 905)

The correctness of the Bureau's thesis that residence alone may provide a valid statutory basis for the imposition of an inheritance tax depends on whether the Legislature intended that result in adopting the Transfer Inheritance Tax Law. The specific inquiry is whether the word "residence" as used in the statute should be read literally or should be equated with the term "domicile." See *State v. Benny,* 20 *N. J.* 238, 252 (1955); *State v. Garford Trucking, Inc.,* 4 *N. J.* 346, 353 (1950).

The comment in the *Restatement, Conflict of Laws,* § 9 (1934), points up this issue:

"The word residence is often but not always used in the sense of domicile, and its meaning in a legal phrase must be determined in each case. It is sometimes used as equivalent to domicile; some-

times it has a broader meaning; and sometimes a narrower meaning. It may mean something more than domicile; the domicile, namely at which a person is resident. On the other hand, it may mean something less than domicile; a dwelling place adopted for the time being, but not necessarily with such an intention of making a home and as to create a domicile. The phrase 'legal residence' is sometimes used as the equivalent of domicile." (*Comment* (e), at *p.* 20)

We look first to the meaning that the Transfer Inheritance Tax Bureau has attributed to this term in its administration of the statute. We find that the Bureau has long and consistently interpreted "residence" to mean "domicile." See *Fowler v. Margetts,* 7 *N. J. Super.* 297 (*App. Div.* 1950). Indeed, in the present case the Bureau's covering letter of August 31, 1965 declares that the enclosed statement of tax due shows "the basis upon which the Bureau determines that the decedent was a domiciliary of the State of New Jersey."

■ Throughout the present tax proceedings and in the Bureau's forms appear references to "domicile," inescapably pointing to the conclusion that the determination of domicile in New Jersey was assumed to be the basis for the imposition of the tax. This long continued practical interpretation given by the agency to the statute which it was required to administer is entitled to considerable weight in determining the legislative intent. See, *e. g., Sutherland, Statutory Construction* (3*d ed.* 1943), § 5103.

■ Our Transfer Inheritance Tax Act, when first enacted in 1909 (*c.* 228), contained the word "resident." It has been amended many times, including the extensive revisions of *L.* 1962, *c.* 15 and *L.* 1962, *c.* 61. Yet the Legislature has never changed the word or attempted to define it to mean other than domicile — this in the face of the ·construction adopted and consistently applied by the Bureau and the courts. It is particularly significant that in 1944 the Legislature, apparently concerned by the possible inequity of multiple inheritance taxes sanctioned in *Aldrich, supra,* authorized the State Tax Commissioner to compromise estate and inheritance taxes with other jurisdictions where "investigation dis-

closes a reasonable doubt regarding domicile." *N. J. S. A.* 54:38A–1. Where the Legislature amends a statute after it has been administratively construed, leaving intact that language, it may be inferred that the administrative interpretation has its approval. See *Walsh v. Department of Civil Service,* 32 *N. J. Super.* 39, 48 *(App. Div.* 1954) ; 2 *Sutherland, Statutory Construction (3d ed.* 1943), § 5109.

Domicile was basic to the decisions, not only in *Fowler* but also in *Cromwell v. Neeld,* 15 *N. J. Super.* 296 *(App. Div.* 1951), and *In re Dorrance,* 115 *N. J. Eq.* 268 *(Prerog.* 1934), and 116 *N. J. Eq.* 204 *(Prerog.* 1934), affirmed 116 *N. J. L.* 362 *(E. & A.* 1936), *certiorari* denied 298 *U. S.* 678, 56 *S. Ct.* 949, 80 *L. Ed.* 1399 (1936). This interpretation of residence as being the equivalent of domicile for purposes of death taxes seems to be in accord with the generally accepted view. See *Restatement, supra,* § 9.

We must therefore consider whether decedent was "domiciled" in this State within the intendment of the Transfer Inheritance Tax Act. Domicile is defined in the *Restatement, Conflict of Laws,* § 9 (1934), as the "place with which a person has a settled connection for certain legal purposes, either because his home is there, or because the place is assigned to him by law." As the comment to that section states:

"Domicile is not the only place with which a person has a connection for legal purposes. Domicile differs from such other places both in the nature of the connection and in the legal purposes for which such connection is important. Thus a person may be a 'resident' or 'inhabitant' or a 'citizen' of a place without being domiciled therein, although such 'residence,' 'inhabitance,' or 'citizenship' may be significant for some legal purposes. Many legal questions depend upon domicile irrespective of residence, inhabitancy or citizenship." *(Comment* (a), at *p.* 17)

See also *Kurilla v. Roth,* 132 *N. J. L.* 213, 215 *(Sup. Ct.* 1944).

In addition to the generally accepted principle that the concept of "domicile" may have different content and shades of meaning depending upon the context in which

it is used, certain other basic principles are generally agreed upon. Every person has a domicile at all times, and no person has more than one domicile at any one time. *Restatement, supra,* § 11. A domicile once established continues until it is superseded by a new one. Domicile may be acquired in one of three ways: (1) through birth or place of origin; (2) through choice by a person legally capable of choosing his domicile, and (3) through operation of law in the case of a person who lacks capacity to acquire a new domicile by choice. *Id.,* § 26.

█ In the present case it is evident that decedent was so advanced in senility at the time she left her New York home to live in New Jersey that she did not possess the requisite mental capacity to make a new domicile by choice. Such glimmerings of rationality as she was capable of expressing would suggest that she was not desirous of changing her place of domicile or residence. We observe, however, that Francis McIlvaine did discuss with his sister the matter of coming to live at his home. He testified: "She agreed to it temporarily. * * * She said she would stay for a while, but not long. The while was indefinite."

█ Since decedent clearly lacked capacity to acquire a new domicile in this State through her own volition, the inquiry must be made whether she did so by operation of law. Had she at the time of her death, by reason of the circumstances arising out of her incapacity and residence with her brother, acquired such a settled connection with this State that she became domiciled here within the meaning of the inheritance tax statute? We hold that she did.

Mrs. Gillmore was 92 years of age when she left her New York apartment for the last time in 1963 to come to her brother's home in Summit. Except for that brother and his family, she had no other surviving relatives. She owned no real property in New York or elsewhere. Her personal property, aside from the furniture in her apartment, her clothing and personal effects, consisted of a checking account in Chemical Bank New York Trust Company and various securities

in a custodian account in that bank. She had lived alone in her New York apartment for over 40 years and had never owned or rented a residence in any other state.

From 1921 to 1962 decedent filed or had filed on her behalf a New York State income tax return as a resident of New York. No New York return was filed on her behalf for either the year 1963 or 1964. She also filed a federal income tax return in New York — at least from 1922 to 1962. The federal income tax return filed for the taxable year 1963 showed her address as that of her brother's house in New Jersey. The federal returns for the year 1962 and prior thereto and the state returns filed in New York listed her address as the Chemical Bank New York Trust Company, by whom the returns were prepared.

There is evidence that earlier in her life she had been active in community affairs centered in New York, but her ties with events and people in that city naturally loosened and diminished towards the end of her life because of advanced age and deteriorating mental and physical faculties. It appeared that she traveled a great deal in the later years of her life, returning after each trip, however, to the apartment which she still maintained. The record shows that she voted in New York from 1922 to 1962 notwithstanding that her physician had noted in 1961 such a definite change in her mental and physical condition that she had become totally unable to manage her affairs. He declared that her condition became strongly progressive about six months prior to April 1963; her brother had expressed a wish to take her to his home in New Jersey, and he, as her physician, had urged that this be done. She was then unable to walk without help and her vision was seriously impaired. According to him, however, she knew that she could not take care of herself.

It was therefore perfectly natural and proper that she should leave her New York residence, however, reluctantly, and come to live with her only brother and sole next of kin. She had no one else to care for her and was unable to care for herself. She had been dependent upon him in recent years

to help her in her financial matters. Inevitably, she now became completely dependent upon him.

Considering Mrs. Gillmore's age and her condition and the circumstances which existed when she came to New Jersey, it must be evident that although she may have had the illusion she was making a visit, she was leaving New York permanently. Any prospect of returning could only be a figment of the imagination. The "days of her years" were far beyond "three score and ten." Her gray and apathetic condition and her advanced age forbade the cherishing of a "long hope."

The few remaining ties that decedent had with her New York home were rapidly and completely severed. The hope that she could live out her remaining years with her brother at his Summit home quickly proved to be unrealistic. McIlvaine and his wife were soon convinced that they were unable to provide the care necessitated by his sister's condition. Consequently, he made arrangements to place her in the Evergreen Nursing Home in Summit. At some time, it is not clear when, he obtained a power of attorney by which he was able to draw on her account in the New York bank in order to pay her expenses.

In August 1963 he made application to the Chancery Division of the Superior Court in Union County for an adjudication that his sister was mentally incompetent, and for the appointment of himself as guardian of her person and property. We deem it significant that the complaint in that proceeding recited that McIlvaine was domiciled and had his residence at 264 Oak Ridge Avenue, Summit, and that his sister "is domiciled and * * * has had her address at 264 Oak Ridge Avenue, Summit, New Jersey and is presently residing at the Evergreens Nursing Home, Evergreen Road, Summit, New Jersey." We note, further, that in his affidavit annexed to the complaint McIlvaine swore on July 24, 1963 that the matters stated in the complaint "are true to my personal knowledge."

The significance of these representations becomes readily apparent when it is borne in mind that decedent's residence

*and* domicile in this State were the foundation upon which rested the Chancery Division's jurisdiction to make the determination as to her incompetency and to appoint her brother as guardian of her person and property. See *In re Devausney,* 52 *N. J. Eq.* 502 (*Ch.* 1894) ; *R. R.* 4 :116–2 (*a*). Their importance is further underscored by the fact that they were manifestly included in the complaint in compliance with the specific mandate of *R. R.* 4 :102–1 (*b*). That rule requires the complaint to state, among other things, the name, age, domicile and address of the alleged incompetent.

That decedent's domicile in this State was regarded as a crucial factual issue as well as a technical legal requirement clearly appears from the transcript of the hearing at the incompetency proceeding. After McIlvaine gave testimony that decedent was residing with him at Summit, the trial judge interrogated him as to the length of her residence with him there and was twice assured at this point (and in McIlvaine's presence) by his New Jersey attorney that "her domicile according to the plaintiff is Summit."

On the basis of this hearing the court on August 26, 1963 appointed McIlvaine as guardian of Mrs. Gillmore's person and property. Pursuant to the authority and the duty thus cast upon him to provide for his ward's person and property, he duly qualified as guardian. His attorney promptly obtained an order for the transfer of her securities in the New York bank and their deposit with the Trust Company of Morris County at Morristown. That order provided that the securities so deposited in the New Jersey bank should not be withdrawn except by the authority of a special order of the New Jersey court.

McIlvaine opened a checking account in the latter institution and continued to maintain his ward at the Evergreen Nursing Home until her death in 1965. As her guardian he executed and signed her 1963 federal income tax return in which he described his home address as "Francis McIlvaine, Guardian, 264 Oak Ridge Ave., Summit, N. J." He declared also in that return that her address for the 1963

return was different than in 1962, which previous address he reported was "c/o Chem. Bank N. Y. Trust Co., N. Y." In the summer of 1963 he also arranged for the removal of decedent's furniture to his own home. He paid the rent for the New York apartment, the lease for which expired in September of that year. Decedent had not renewed it in the spring of 1963 for the following year. Noteworthy also is the fact that neither he nor the individual at the New York bank who had prepared and filed the federal and New York income tax returns for years previous to 1963 did so for that year.

We are satisfied on the basis of the unique circumstances present in this case that decedent had acquired a New Jersey domicile by operation of law at the time of her death. For all practical purposes, her permanent residence was here. Certainly she had no residence elsewhere. Long before her death all her remaining ties with her former home had been cut. It can fairly be said that she came to spend the rest of her days and remained "with as much permanency as life affords." See *First Trust and Deposit Company v. Goodrich,* 3 *N. Y.* 2d 410, 165 *N. Y. S.* 2d 510, 515, 144 *N. E.* 2d 396, 399 (*Ct. App.* 1957).

At her death this State clearly had the most substantial interest in her welfare. New Jersey had extended the umbrella of its protection over her for a considerable period prior to that time. Acting in good faith and in her interest, her brother, as her sole surviving next of kin, had invoked the aid of the Chancery Division for the appointment of himself as the guardian of her person and property. Under that court's jurisdiction he continued to manage and control her affairs for the remainder of her life. Having been lawfully invested with authority over her person and property, it would seem entirely appropriate that his actions should also control and determine her domicile.

We are not impressed with his protestations in this proceeding that it was never intended that she acquire a domicile here. His actions at a time when he had no motive to mis-

state the facts or his own intention, as well as the actions of all of those who were then concerned with her welfare, bespeak an intention that her domicile should follow his. In this connection, we note that the attorney who conducted the incompetency proceeding was not called as a witness to explain the basis upon which he and his client made the representations and recitals as to decedent's residence and domicile. Nor was any representative of either the New York or New Jersey banks asked to explain why the various tax returns were prepared and filed as they were.

Consequently, we conclude that decedent was domiciled in this State at the time of her death within the meaning of the Transfer Inheritance Tax Act, and that the tax assessed by the Bureau was properly imposed.

We perceive no necessity for deciding the broader issue of whether the appointment of a guardian for decedent may — without more — have had the legal effect of determining her domicile, not only for purpose of inheritance taxes but also for all other purposes. See *Restatement, supra,* § 40, where it is said:

"If a guardian of the person is appointed for one who is mentally deficient or of unsound mind and who is incapable of acquiring a domicile of choice, the ward acquires a domicile with the guardian if he lives with him within the state of the latter's appointment." (*Comment* (e), at *p.* 64)

And see § 37 where the same rule of domicile is said to be applicable in the case of a court-appointed guardian for a child.

Notwithstanding the categorical character of the *Restatement* Comment, it appears that a divergence of opinion has developed among the few jurisdictions that have had reason to consider the exact effect on the domicile of the ward of a court appointment of a guardian.[1] The increasing mobility

---

[1] See Annotation, "Change of state or national domicile of mental incompetent," 96 *A. L. R.* 2d 1239 (1962). See also Graveson, "Capacity To Acquire a Domicile," 3 *Int'l L. Q.* 149 (1950) ; Note

of our society, accompanied by the tremendous increase in the number of the aging and the problems arising out of their care, paralleled by a great increase in the extent to which intangibles now constitute wealth, constitute developments in our society which seem likely to present many new problems not readily resolved by traditional conflicts of law rules conceived in a less transient society. See Morrill, "Multistate Estates," 103 *Trusts and Estates* 734 (1964). See also dissenting opinion of Mr. Justice Frankfurter in *State of Texas v. State of Florida, supra,* 306 *U. S.,* at *p.* 429, 59 *S. Ct.* 563, 83 *L. Ed.,* at *p.* 837. Consequently, judicial restraint dictates that we limit our decision to the situation at hand.

Nor do we deem it necessary to consider the additional ground for affirmance advanced by the Bureau, that appellants are precluded from attacking the Bureau's determination as to domicile by reason of the Chancery Division judgment in the incompetency proceeding. The theory here is that since McIlvaine's appointment as guardian was procured on the basis of his representations as to domicile, the doctrine of equitable estoppel should preclude him and his ward's estate from asserting a contrary position now. *Cf. In re Dorrance, supra,* 115 *N. J. Eq.,* at *p.* 271. While this argument has much force, particularly since McIlvaine, as one of the executors of decedent's will, is a party to this action and since he and his family are the principal beneficiaries of her estate, it seems preferable to us that the issue of domicile be determined in this proceeding anew and on the merits.

Affirmed.

---

"Domicile as Affected by Compulsion," 13 *U. Pitt. L. Rev.* 697 (1952) ; Note, 5 *U. C. L. A. L. Rev.* 312 (1958) ; Comment, 26 *U. Cin. L. Rev.* 629 (1957).